HAROLD FRISNEGGER, Plaintiff and Appellant, v. HARRY C. GIBSON, Defendant and Respondent.

No. 14189.
Submitted Feb. 5, 1979.
Decided Aug. 1, 1979.
598 P.2d 574.

Mr. Justice Harrison dissented with an opinion.

Hash, Jellison, O'Brien & Bartlett, Kalispell, Kenneth E. O'Brien, argued, Kalispell, for plaintiff and appellant.

Hoyt & Lewis, Great Falls, John Hoyt, argued, Great Falls, for defendant and respondent.

MR. JUSTICE SHEEHY delivered the opinion of the Court.

This is an appeal by Dr. Harry C. Gibson, an ophthalmologist of Kalispell, Montana, from a judgment of $175,000 against him in favor of the plaintiff, Harold M. Frisnegger on a malpractice claim.

Dr. Gibson admitted liability during the course of the trial. In his appeal from the judgment in the District Court, Eleventh Judicial District, Flathead County, he contends that the damage award was excessive, and is not supported by the evidence; and that the jury was improperly instructed by the trial court.

On October 16, 1975, Frisnegger had a chalazion, a small growth, in the middle of his left upper eyelid. He went to the office of Dr. Gibson for the removal of the growth. Dr. Gibson said he was in a hurry, but agreed to perform the removal.

Dr. Gibson applied an anesthetic to his left eye area but the first administration of the anesthetic seemed ineffective. On his second attempt to administer an anesthetic with a needle and syringe, the doctor inserted the needle directly into Frisnegger's eye and lens. The chalazion was removed. Frisnegger did not know that the needle had been inserted directly into his eye. He was given some salve to take several times a day to keep down infection and was told to return to the doctor on October 23, 1975.

In the interim, Frisnegger tried to go hunting, but his left eye vision was blurry and became cloudy, so that he had to return home.

On October 23, 1975, Frisnegger saw the doctor for three hours and was sent by the doctor to a hospital for x-rays and then to another ophthalmologist, Dr. John Stephan, who told Frisnegger that his eye had been pierced.

On the following afternoon Dr. Gibson told Frisnegger that he had slipped with the needle and that the eye would probably get worse. He told Frisnegger he was entitled to compensation. When Frisnegger was told this, he became very agitated and walked out. The doctor's notes indicate "he became quite agitated (justifiably)."

Before the incident, Frisnegger had 20/20 vision. When examined by Dr. Gibson a few days after the incident, he had a cataract caused when the needle pierced the lens. Frisnegger's vision is now very blurry. He can see only light and has "tracers" in his eye. The cataract appears to have destroyed its useful vision.

Frisnegger was 51 years old at the time of the incident. He had worked formerly as an assistant service manager in an automobile shop in Great Falls and at the time of the incident was working as the service manager at an automobile shop in Kalispell. His job involved about 60% paperwork. He felt that he had reached the top of his career at the auto service shop. Before the accident, he involved himself in such things as tying flies, doing carpentry work and kept himself busy doing things, and working and playing with his family. He was particularly fond of hunting and snowmobiling.

After the incident, the cataract formed immediately. He has become nervous and tense, gets angry quickly, is irritable, and does not spend much time with his family because he now brings home work so that he can do it in the evening. He finds that in connection with his work at the auto service shop, he is unable to work a full shift because his eyes get tired and he must stop to rest his eyes. He gets headaches in the afternoon, so that his work takes him a couple of extra hours each day.

He does not seem to be able to relax; he does not enjoy fishing and hunting. On weekends, he rests up and relaxes so that at the beginning of the week he is again refreshed but tires out and becomes tense and irritable by the end of the week. He is worried about being able to maintain his job; he worries about his good eye; he is unsteady on his feet and stumbles.

Five medical persons testified during the trial. Dr. Gordon Larson and Dr. Herman Albert Walters testified on behalf of the planintiff; Dr. Charles L. Gates, Dr. Allen S. Quint, and the defendant Dr. Gibson testified on behalf of the defendant.

Dr. Gordon Larson is a Spokane ophthalmologist. He qualified as an expert on the removal of eye cataracts. He stated a cataract operation involves the removal of the eye lens. The operation itself

is considered low risk surgery. The complication arises in the post-operative use of the eye. In order to be useful, a contact lens must be used but such a lens has a fixed focal ratio so that Frisnegger, after such an operation, would see clearly through the contact lens part of the time and at other times would not, depending on the distance he was looking. The tolerance for contact lenses varies from patient to patient. Lens transplants are being utilized but are not at the stage where the doctor feels they ought to be used. He has advised Mr. Frisnegger that he should delay the cataract operation until either technology has advanced in the contact lens situation or more data comes in with respect to intra-ocular lenses. His examination of Frisnegger disclosed 20/20 vision in the right and and a 20/400 vision in the left eye. Frisnegger's functional vision would not improve with a contact lens, although for the focal range of the contact lens, his left eye would be restored to its normal vision.

Dr. Herman Albert Walters is a clinical psychologist who teaches at the University of Montana. He qualified as a teacher on the diagnosis of emotional disorders, psychological assessments, depression and psychotherapy. Two of his specialties as a psychologist are depression and suicide. He examined Frisnegger about two weeks before the trial at the request of Frisnegger's attorney. He determined that Frisnegger is suffering from severe anxiety and that he shows all the major symptoms of reactive depression. He feels that this depression is moderate, bordering on severe. Dangers arising from this condition include possible loss of ability to work, loss of ability to function emotionally with his family and others, and in the most severe degree a serious danger of suicide. Frisnegger is afraid of another operation on his eye because of "what happened last time." Walters expected within a year Frisnegger would have a very severe depression which would be totally disabling. Such a depression will usually run from six to eleven months, remit somewhat and then recur. The recurrences would go on indefinitely. For an indefinite number of years he would estimate it would cost Frisnegger a minimum of $2,500 to $3,000 a year for direct counseling.

On behalf of the defendant, Dr. Charles L. Gates, a Spokane ophthalmolgist, testified. He has performed some 5,000 cataract operations. He uses the cryosurgery or freezing method almost always. He described a plastic lens implant, but stated that it was quite experimental. He had examined the plaintiff. He found the left eye to have 20/300 vision. The proper thing for Frisnegger is to have the cataract removed. A permanent contact lens is not available at this time and they are experimental. At the present time the contact lens has to be changed every few months. He would estimate that a cataract operation of Frisnegger would give him between 95 and 100% normal vision afterwards, with the aid of a contact lens. Cost of surgery operation would amount to between $750 and $1,000, and for hospitalization up to $620. He would estimate $50 per year for contact replacement costs. He did not agree with Dr. Larson that Frisnegger's functional vision would not be improved.

On cross-examination, Dr. Gates stated that he had not recommended that Harold Frisnegger have a cataract operation, and he had never so recommended.

Dr. Allen Quint, a Kalispell psychiatrist, also testified on behalf of the defendant. He had examined Frisnegger and found him to be healthy, psychologically well, but experiencing a mild reactive depression. He found nothing to indicate that a severe reactive depression might develop. He did not believe that Frisnegger should have counseling for the rest of his life.

Dr. Gibson testified on his own behalf. He stated, over objection, that he would pay for the cost of the cataract operation which he estimated to be approximately $700 for the surgeon and up to $750 for the hospital. He would place the chances of successful surgery in the range of 95 to 98%. He would also pay for Frisnegger's lost time to a value of approximately $800.

The foregoing, of course, is only a brief resumé of the evidence. It is intended to illustrate the factual issues before the jury on which it has made its decision.

Essentially, the doctor contends that the damages were excessive

and not supported by the evidence on these factors:

1. That Frisnegger's vision could be restored to normal with a cataract operation.

2. That Dr. Larson found no medical reason why the operation could not be performed.

3. That a maximum loss of work if the operation were performed would range from ten days to two weeks.

4. That a cataract operation is low risk surgery, that it is not painful; success between 95 to 99% is possible for a cataract operation.

5. Frisnegger's visual acuity would be better than normal after the operation.

6. Cost was not an issue since Dr. Gibson would pay for the operation and hospital costs.

7. The prognosis for no depression after a successful operation was good.

Dr. Gibson further contends that the psychologist Dr. Walters is not a credible witness because Frisnegger had not sought his professional help; that Walters examined Frisnegger within two weeks of the trial at the attorney's request; that Frisnegger missed no work whatsoever because of the eye incident; that no discussion had been had by Walters with Dr. Larson to see if Frisnegger's vision could be restored; that Walters was not treating Frisnegger with follow-up therapy.

Finally, Dr. Gibson contends that the court erred in giving its instructions to the jury.

We deal first with the contention that Dr. Walters was not a credible witness. This contention is really a part of the larger issue raised by Dr. Gibson, that the evidence does not support the verdict. See *Casey v. Northern Pac. Ry. Co.* (1921), 60 Mont. 56, 68, 198 P. 141, 145.

Under former section 93-2001-1, R.C.M.1947 (not carried over into Montana Code Annotated) the jury is the judge of the value or effect of the evidence addressed to it, except when it is declared to

be conclusive. The province of the jury is to decide conflicts in the evidence, and unless the testimony of the prevailing party is characterized by such inherent improbability as to destroy it, the Supreme Court will not interfere. *Callan v. Hample* (1925), 73 Mont. 321, 236 P. 550. Whether the determination be made by a jury (*Casey*, supra) or by a judge sitting without a jury (*Parchen v. Chessman* (1917), 53 Mont. 430, 164 P. 531), the resolution of conflicts in the evidence by the trier of facts is binding upon the appellate court unless the testimony on which the decision depends is so inherently improbable or transparent or so contradictive to other testimony in the case as to deny such testimony all claims to belief. See *First State Bank v. Larsen* (1922), 65 Mont. 404, 211 P. 214.

We find nothing inherently improbable in the testimony of Dr. Walters. In fact, there was other testimony seemingly corroborative of the Walters testimony which doubtless weighed in the estimation of the trial jury. Dr. Walters found a moderate to severe reactive depression. On the other hand, Dr. Quint noted a mild reactive depression. Dr. Walters found a strong chance of recurrence of reactor depressions in later years, even after surgery. Dr. Quint felt that if the surgery had a good result, there was little chance of reactive depression recurring. Dr. Walters felt that Frisnegger would need psychiatric counseling for the remainder of his life. Dr. Quint stated he would not form such an opinion because he could not say for sure but in a mild case he would feel that such extended counseling would not be necessary. Moreover, on cross-examination of Dr. Walters, it was developed that Frisnegger had not sought the professional help of Dr. Walters and that Dr. Walters had not been treating Frisnegger with follow-up therapy.

Thus, the jury had before it all of the elements of conflict in the Walters testimony which are now being argued to this Court. The difference of the opinions related not to the existence of the psychological problems arising out of the injury to the eye, but rather to the degree of severity of those psychological problems. In that situation, on the facts that appear from the transcript, the jury

was entitled to consider the evidence for both sides and to make its decision thereon.

The foregoing description of the conflict in the testimony of the psychiatrists illustrates the type of problem presented to us by the other contentions of the doctor that the damages are excessive and not supported by the evidence. On each factor of evidence relied on by the doctor for the contention, there is countervailing evidence which was apparently accepted by the jury. The doctor contends that Frisnegger's vision can be restored to normal with a cataract operation; but there was other evidence that a contact lens with a set focal distance would be required, and the vision of the left eye would be normal only for that distance. The doctor contended that Dr. Larsen found no medical reason why a cataract operation could not be performed; yet Dr. Gates testified that he was not recommending nor never recommended such an operation; and that he would not perform such an operation without first obtaining a medical workup on Frisnegger. Dr. Gibson contends that the maximum loss of work if the operation were performed would range from ten days to two weeks; Dr. Walters testified there was substantial chance of recurring reactive depressions. Dr. Gibson contends that a cataract operation is low risk surgery, not painful, and success between 95 to 99 percent is possible; but it is also admitted that cataract operations are not recommended for persons with medical problems or psychological problems, including reactive depressions. Dr. Gibson also contends that Frisnegger's visual acuity would be better than normal after the operation; on the other hand, such normal vision could be achieved only with contact lenses, and Frisnegger had normal vision to begin with. Dr. Gibson contended that cost was not an issue since he would pay for the operation and the hospital costs; all this was before the jury.

Dr. Gibson contends that the prognosis for no depression after a successful operation was good; Dr. Walters had a contrary opinion.

The appellate rule is that if there is substantial evidence to support the jury verdict based on conflicting evidence, the decision of

the jury is not reviewable unless the evidence is so inherently impossible or improbable as not to be entitled to belief. *Strong v. Williams* (1969), 154 Mont. 65, 460 P.2d 90; *Sumner v. Amacher* (1968), 150 Mont. 544, 437 P.2d 630. We find in the record substantial evidence to support a substantial award of damages by the jury.

We come now to the question of whether the verdict was excessive. This is the real crux of the doctor's contention that the evidence does not support the verdict, since he admitted liability in the first instance. On that point, we examine the verdict to determine whether it is so large so as to shock our conscience, or to induce a belief that it was the product of passion or prejudice. *Kelleher v. State* (1972), 160 Mont. 365, 503 P.2d 29.

Giving every benefit of the evidence to the prevailing party, as we are required to do in questions of this sort, we find a 51 year old male plaintiff, who before the incident was employed as an assistant service manager, earning $1,500 per month with fringes. He had reached the top of his career; he had a well-adjusted family life. He was an active, interested person with indoor and outdoor hobbies and enjoyed 20/20 vision in each eye.

After the incident, we find that he has lost the useful vision in his left eye, has become nervous and tense, irritable and does not spend much time now with his family because to keep his job, he must bring paperwork home with him. He finds his work exhausting, and is now subject to headaches every day. He cannot tie flies, do carpentry work, and has become unsteady on his feet. He is greatly concerned that something may happen to his other eye as well. The impact upon his emotional status has been most serious. He is suffering from moderate to severe reactive depression which, if it becomes severe, may lead him to suicidal tendencies. His depressions will recur, and counseling will cost him $2,500 to $3,000 per year. Simple tasks have become difficult. He suffers from emotional strain, temper flashes and despondency. Assuming he had a successful cataract operation, was fitted with contact lenses, and wore spectacles over them to restore his vision to near normal, his

prognosis would be quite good, but his depression would probably recur, though less severely. He would still be disabled from a psychological point of view. All of this was caused by the injection of a needle into his eye.

In *Salvail v. Great Northern Railway Company* (1970), 156 Mont. 12, 31, 473 P.2d 549, 560, we said:

"The amount to be awarded as damages is properly left to the jury and this Court will not substitute its judgment for that of the jury particularly where, as here, the trial court has approved the verdict by denying a new trial. *Strong v. Williams*, 154 Mont. 65, 460 P.2d 90. It is only where the amount awarded is so grossly out of proportion to the injury as to shock the conscience that this Court will intervene . . . . There is nothing whatsoever in the record to indicate passion or prejudice; on the contrary, there is substantial evidentiary basis justifying the amount of the award."

The award of the jury in this case is sufficiently based upon the record and does not shock our conscience under the circumstances shown here. We note that the trial court denied motions for remittitur and for a new trial, in effect approving the verdict.

The final contentions of the doctor relates to the giving of three instruments by the District Court and the refusal of two instructions offered by the defense.

The doctor asserts error in giving of plaintiff's instruction no. 29 and the refusal of defendant's offered instruction no. 5.

Defendant's offered instruction no. 5 stated as follows:

"You are hereby instructed that the plaintiff cannot recover for any injury or damages that could be alleviated or avoided by surgical operation."

It is obvious that the proposed instruction was mandatory in its nature. When it was refused by the trial court, the doctor submitted his instruction no. 6 (courts no. 13) which was given, and which told the jury:

"It is the duty of any person who has been injured to use reasonable diligence in caring for his injuries and reasonable means to pre-

vent their aggravation and to effect a recovery. One cannot claim damages for that which could otherwise have been avoided by submitting to treatment by a physician, including possible surgery, if an ordinary reasonable person would do so under the same or similar circumstances."

The doctor makes the argument that instruction no. 6, as given left the determination of whether plaintiff should have submitted to surgery to the jury, when as a matter of law, under the circumstances of the case, Frisnegger should have submitted to a cataract operation. The doctor bases his argument in part upon his contention that the testimony of Dr. Walters is incredible and thus not supportive of a verdict *Graham v. Rolandson* (1967), 150 Mont. 270, 283, 435 P.2d 263, 270, and partly upon his contention that the evidence here is clear and conclusive that a reasonable person would have submitted to surgery in this situation, thus making the mitigation of damages a question of law for the court. He cites *Zimmerman v. Ausland* (1973), 266 Or. 427, 513 P.2d 1167.

We have already shown that the credibility of Dr. Walters was properly one for the jury. We do not find the Oregon case to be supportive of the doctor's position. In *Zimmerman*, the defendant contended that a woman with a knee injury should as a matter of law have been required to submit to surgery for her knee or else be precluded from claiming damages for permanent injuries. The Oregon court held that there was no record that she had ever been advised by any doctor that she should subject herself to knee surgery. It found the burden of proof of unreasonable refusal to mitigate damages to be on the defendant and stated that the question whether she should have submitted to a knee operation depended on whether a reasonably prudent person would have done so.

Here the trial court, by giving defendant's instruction no. 6, allowed the jury to consider whether Frisnegger should have submitted to treatment, including possible surgery, on the reasonable person test. Where mitigation of damages is concerned, we have supported the reasonable person test or the ordinary prudent person test in property damage cases. See *Harrington v. Holiday*

*Rambler Corp.* (1978), 176 Mont. 37, 575 P.2d 578; *Spackman v. Ralph M. Parsons Company* (1966), 147 Mont. 500, 414 P.2d 918.

■ We hold that the District Court properly submitted the mitigation issues to the jury on that basis here and that the mandatory instruction requested by the doctor would have been improper where the evidence is conflicting or uncertain as to the duty of Frisnegger to submit to the cataract operation.

The doctor also asserts error in the giving of the trial court of plaintiff's instruction no. 29 (courts no. 15) which relates to the same subject and which told the jury:

"If from the evidence you believe that it is contrary to good medical practice for the plaintiff to submit to a cataract operation, then the defendant may not mitigate or reduce the damages to which plaintiff would otherwise be entitled."

Objection to this instruction was made on the ground that the test to be employed is that of a reasonable and prudent person, and that there was no credible evidence to support a conclusion that a cataract operation would be against good medical practice.

■ This contention is part and parcel of the duty-to-mitigate issue. As we have indicated, the court had instructed the jury that one who is injured is expected to use reasonable diligence in caring for his injuries, and to effect a recovery. Instruction no. 29 informed the jury that the plaintiff had no duty to submit to a cataract operation if it would be contrary to good medical practice. It is uncontroverted in the evidence that there are a number of factors which argue against a cataract operation when the prospective patient is one who has other health problems that make surgery more risky. One of those factors, under the evidence, is reactive depression. Since the instruction was based upon evidence in the cause, it was not an abstract statement of the law. In considering the propriety of giving instructions, we consider the instructions in their entirety, and we read them in connection with other instructions given on the subject, and consider them in the light of the evidence introduced. *Brown v. North Am. Mfg. Co.* (1978), 176 Mont. 98, 576 P.2d 711. Offered instruction no. 29, when consid-

ered in the light of the doctor's offered and given instruction no. 6, read one with the other, are based upon the evidence and properly outlined to the jury the law which applied to the evidence in the case on the duty of the plaintiff to mitigate damages.

On another point, the doctor contends that the jury was improperly instructed on its duty in fixing and awarding future damages. The doctor had offered his proposed instruction no. 8 which read as follows:

"You are not permitted to award a party speculative damages, which means compensation for future loss or harm, which, although possible, is conjectural or not reasonably certain. However, you should compensate the plaintiff for loss or harm which is reasonably certain to be suffered by him in the future as a proximate result of the injuring question."

The court refused this instruction and gave instead the instruction offered by the plaintiff, his instruction no. 33, (courts no. 15) which told the jury:

"You may not award plaintiff damages based solely on speculation or conjecture, however, you should compensate the plaintiff for loss or harm which is reasonably certain to be suffered by him in the future as a proximate result of the injury in question.

"You are further instructed that no definite standard of method of calculation is prescribed by law by which to fix reasonable compensation for pain and suffering past or future, or for the failure of the destruction of his capacity to pursue an established course of life, and no evidence need be introduced to establish the pecuniary value of such damages.

"You are further instructed that your deliberation in this regard should be made calmly and with no prejudice, passion or sympathy toward or against either party to this action."

The objection raised by the doctor is that the use of the word "solely" in the instruction given by the court implies that damages may be awarded based "partially" on speculation and conjecture.

Placing the refused instruction and the given instruction side by side, it is difficult to see that the insertion of the word "solely" in

the given instruction changes much the sense of the jury's duty with respect to future damages. Section 27-1-203 MCA (formerly section 17-203, R.C.M. 1947) provides that damages may be awarded in a judicial proceeding for detriment resulting after the commencement thereof "or certain to result in the future." While no case in Montana has construed this statute, it has always been the practice in Montana to instruct juries that future damages need only be reasonably certain, and not absolutely certain as the statute seems to imply. In holding, as we do, that future damages need only be reasonably certain under the evidence, it must be granted that in determining an award for future damages, a jury, or an expert testifying on the subject, must to some degree engage in conjecture and speculation. When the conjecture and speculation is based upon reasonably certain human experience as to future events, the jury or trier of fact is entitled to rely on that degree of reasonable certainty in fixing and awarding future damages. From that viewpoint, since no man has the gift of knowledge of the future, it is possibly less confusing to a jury, given the task of determining future damages, to be instructed that it may not rely "solely" on speculation or conjecture, but may utilize the reasonable certainty the evidence presents with respect to those damages. We do not read into the instruction as given that the jury could base its award "partially" on speculation or conjecture; rather the instruction fairly plainly tells the jury that it should compensate the plaintiff for loss or harm which is "reasonably certain" to be suffered by him in the future. We do not see that a jury could hear those words without realizing that it was to look to the evidence for reasonable certainty on the subject. We find no error in the instruction as given.

■ Another instruction objected to by the doctor relates to instructions for determining damages for loss of wages, costs of examination or treatment and loss of future earning power. The instructions given by the court were substantially in accordance with the Montana Jury Instruction Guide (MJIG).

The instruction is a long one but the first paragraph is substan-

tially the language of MJIG no. 30.02 relating to past loss of earnings. Paragraph two is substantially the language of MJIG no. 30.04, relating to loss of future earnings; and the fifth paragraph is substantially the language of MJIG no. 30.05, relating to past and future medical expenses. As a matter of fact,. the instruction as given was amended from the MJIG form so as to make it more cautionary, because the words "if any", were inserted after each of the elements of damages set forth in the instruction. Again, we find the instruction relates to the evidence in the case. It was shown that the plaintiff was earning $1,500 a month at his job; the doctor, through his evidence, established the amount of time that plaintiff might need to take off from work in order to obtain a cataract operation, and have recuperative time. Dr. Walters testified that psychiatric counseling would be expensive in the future; the evidence showed that the plaintiff was not as effective an employee as he was in the past, which affected his earning power, whether the wages were actualy lost or not. In that situation, we view the instruction, as we have noted above, from the viewpoint of whether it relates to the issues framed by the evidence. *Brown*, supra. We find no prejudicial error in this instruction.

In approving the instruction based on MJIG no. 30.02, with the words "if any" inserted after each element of loss, we do not thereby imply that such instruction may safely be given where there is no evidence in the record to support each of those elements. The better practice would be to eliminate from the instruction any reference to elements not found on the evidence, rather than to rely on the words "if any" to remove prejudice or error.

In sum, this case is one where the defendant is arguing that the amount of damages awarded by the jury was excessive. The objections which the defendant has raised to the weight of the evidence, the credibility of witnesses, and the instructions of the jury are not in themselves sufficient to cause a reversal of the judgment. We are left with a consideration of whether in view of the evidence, the amount of the damages awarded is so great as to shock the conscience of the court, or lead us to believe that the verdict is the

result of passion or prejudice on the part of the jury. We have said that each case must be determined by its peculiar circumstances, as affecting the question of actual damages suffered. *Cline v. Tait* (1945), 116 Mont. 571, 581, 155 P.2d 752, 757. We are ever mindful that juries are the triers of fact, and where it does not appear that the jury has acted arbitrarily or capriciously, its decision as to the amount of damages must stand. There is no hard and fast rule by which we may determine the maximum compensation that should be allowed for personal injuries and for this reason, as we have said, courts are ever reluctant to interfere with a jury's award. *Parini v. Lanch* (1966), 148 Mont. 188, 418 P.2d 861. In viewing the evidence in favor of the plaintiff, as we must in appeals of this type, there is no doubt that here the plaintiff has suffered substantial and grievous injuries, however unintentionally they may have been inflicted. Damages in tort cases are intended to be compensatory and no rule of law allows an appellate court to reduce a damage award out of sympathy for the plight of the defendant any more than the jury may increase the damages out of sympathy for the plight of the plaintiff. The jury appears to have acted with due regard for its duty in this case, and the trial judge felt that the jury award was supported by the evidence when he denied the motion to grant a new trial. In those circumstances, and in the light of our review of the evidence, we do not find ourselves commanded in the application of appellate rules either to grant remittitur to reduce the award or to grant a new trial on the issue of damages.

Accordingly, the judgment of the District Court is affirmed.

MR. CHIEF JUSTICE HASWELL and JUSTICES DALY and SHEA concur.

MR. JUSTICE HARRISON dissenting:

I must respectfully dissent, first, on the admission of the testimony of Herman A. Walters, clinical psychologist, and second on the failure of respondent to have corrective surgery.

Taking first the testimony of Walters, after careful review, I find it so speculative and so incredible that it should not, in my opinion,

have been allowed to go to the jury. Reviewing the fact situation here, it should be noted that Walters first appeared on the scene as a witness just two weeks before trial. He had an hour and a half interview with respondent and his wife and one telephone interview. He never treated respondent, nor did he search out competent medical information from the numerous physicians who had been treating him for over two years. His findings of a depressed individual are contra to the competent medical testimony of Dr. Gordon Larson, respondent's doctor, who had treated him at least seven different times over the two-year period.

Error, in my opinion, was also committed in not properly instructing the jury on respondent's duty to mitigate damages. The testimony of Drs. Larson and Gates showed respondent had a normal eye, except for the cataract, and that the risk of the operation was low and not painful. Both witnesses indicated that with surgery there was a 95 to 100 percent chance of a return to normal vision:

Montana case law recognizes the general rule that an injured party must use ordinary diligence to effect a cure and thus to mitigate damages. The standard is described variously as "that of the reasonable person" and that of the "reasonably prudent person." The two are not the same, even though this Court has said that the former is "in other words." *Tiggerman v. City of Butte* (1911), 44 Mont. 138, 119 P. 477; *Freeman v. Chicago, M. & St. P. Ry. Co.* (1916), 52 Mont. 1, 154 P. 912; *Stokes v. Long* (1916), 52 Mont. 470, 159 P. 28. See also, *White v. Chicago & N. W. Ry. Co.*, (1910), 145 Iowa 408, 124 N.W. 309; *Donovan v. New Orleans Ry. & Light Co.* (1913), 132 La. 239, 61 So. 216; *Cero v. Oynesando* (1927), 48 R.I. 316, 138 A. 45. *Cero* is an early cataract case before the present day surgical skills where the surgeon testified that the operation would probably be a success. In contrast, the 1978 operation success is from 95 to 99 percent of the time. See also, 62 A.L.R.3d 9 (1975), entitled "Duty of Injured Person to Submit to Surgery to Minimize Tort Damages."

I would reverse the decision and send the case back for a new trial.