No. 86-543

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

GREG J. STARK,

        Plaintiff and Respondent,

  -vs-

THE CIRCLE K CORPORATION,

        Defendant and Appellant.

---

APPEAL FROM:  District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Milodragovich, Dale & Dye; Kim L. Ritter, Missoula,
Montana
Streich, Lang, Weeks & Cardon; Lawrence A. Katz argued,
Phoenix, Arizona

    For Respondent:

        Lynch & Best; John F. Lynch argued, Great Falls,
Montana

Submitted: October 21, 1987

Decided: March 1, 1988

Filed: MAR 1 - 1988

*Ethel M. Harrison*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Circle K Corporation appeals from a jury verdict from the Second Judicial District, Silver Bow County. The jury awarded Greg Stark (Stark) $200,000 compensatory and $70,000 punitive damages for breach of the implied covenant of good faith and fair dealing relating to his termination. We affirm.

Circle K presents the following issues for our review:

1. Was there sufficient credible evidence to support a jury verdict finding a breach of the covenant of good faith and fair dealing in the termination of Stark's employment?

2. Was there substantial credible evidence for the jury to properly award $200,000 of compensatory damages?

3. Did the District Court improperly allow the economic damages summary to be submitted into evidence after settlement of instructions?

4. Was there sufficient credible evidence to support the award of punitive damages?

Stark graduated from Butte High School in 1973. He had no other vocational or educational training. Following two years of military service, Stark held several jobs, including two in the retail grocery business.

On December 22, 1981, Stark applied for a job with Circle K in Butte. The application provided:

> I further understand and agree that . . . subsequent to being employed, I may be dismissed with or without cause.

Circle K subsequently hired Stark at minimum wage as a clerk on December 29, 1981. Circle K's opinion of Stark's ability was manifested by a number of promotions and salary increases. On April 24, 1982, he was promoted to assistant

manager in Butte and received a wage increase. On June 14, 1982, he received another wage increase because he "[worked] hard on the job and is an asset to the company." On July 19, 1982, he was promoted from assistant manager to acting manager in Butte and later, Anaconda. He was promoted to "exempt" status manager and given another raise to $1,000 per month on November 1, 1982, because Stark had been "doing a good job" and had "good inventory." Positive job evaluations resulted in continued pay increases until he was promoted to zone manager on November 1, 1983.

As a zone manager, Stark was responsible for supervising eight stores located in Butte, Helena, Townsend, and Anaconda. He held the position of zone manager up to the date of his termination from Circle K on August 22, 1984. His earnings had increased to approximately $17,000 per year at that time. In addition, Stark also received a company car which he valued at approximately $3,000 per year.

During the course of Stark's employment, his job performance was regularly evaluated. He was consistently rated as very good to superior in the company's performance review appraisals. Stark's rating as the number one zone manager in the district reflected his abilities and achievements.

On April 1, 1984, Don Herring was promoted from zone manager to district manager of the Great Falls district. As such, he supervised four zone managers and was responsible for 25 stores. Herring performed the evaluations of his zone managers. He rated Stark as his best zone manager.

However, Herring soon became alarmed about inventory shortages reported by the district stores. During conferences in Great Falls with the four zone managers, inventory control was discussed. Herring also brought in, at

some point, a new inventory person he had formerly worked with in Oregon.

Preliminary inventory data for the month of August indicated a significant inventory loss at three Butte stores in Stark's zone. Herring requested that Stark meet him in Helena on August 14, 1984. Prior to the meeting, Herring prepared a written document entitled "Employee Counseling Report." This document, dated August 15, 1984, stated:

> Your inventory's [sic] in three stores are over $4,000 short, this is totally unacceptable. You are being put on 30 day probation, during this time I would expect you to make every effort to correct the situation.

Herring had Stark read the report and requested that he sign. Stark refused to sign because he felt the report was unfair and inaccurate. Stark stated the report was inaccurate because the new inventory person brought in by Herring was not conducting the inventories properly. Stark also informed Herring that the report was unfair because other managers in the district had similar shortages and were not written up. Herring indicated he would look into the matter. The meeting ended at this point.

A few days later, Stark attended the usual manager's meeting in Great Falls. Herring did not mention the report or the inventory shortage at this time. On August 22, 1984, Herring and Stark again met in Helena and Herring once more offered the report to Stark to sign. Stark again refused and was terminated for insubordination relating to his refusal to accept responsibility for the inventory shortage.

The parties disagree as to whether Herring had planned, prior to the refusal on August 22, 1984, to fire Stark. Herring testified he had no intention of firing Stark unless Stark refused to sign the report the second time. The evidence showed that Herring had Stark's final pay check with

- 4 -

him. In addition, Herring brought another zone manager with him from Great Falls to drive Stark's company vehicle. The other zone manager was dropped off at a near-by coffee shop just prior to the Stark-Herring meeting.

At trial, the amount of inventory shortage was strongly contested. Although Herring had indicated at the August 14, 1982, meeting, that he would check into the figures, he failed to do so. Stark indicated at trial that he had rechecked the figures and found significant discrepancies. Large inventory overages in the three Butte stores for September tend to support Stark's allegation.

The parties also contest whether the termination was in accord with Circle K policy. At the time in question, Circle K had published a pamphlet setting forth company policy entitled "Zone Manager's Guide." The guide required, inter alia, consistent discipline, progressive discipline, and written rules which are well-known to the employees. This type of discipline was designed to "provide guidelines for conduct and a set of expectations which an employee may rely upon." Punishment should "accurately reflect the nature and seriousness of the proven offense and the employee's prior record."

Herring admitted the policy guide also applied to a district manager disciplining a zone manager. Concerning termination, the guide provides:

Termination and the Issue of "Just Cause"

Unemployment compensation is often rewarded because the employer has failed to produce evidence of "just cause". That is, was this employee terminated for a reason related to misconduct, negligence on his or her part, which despite efforts by the employer could not be corrected?

When you have decided to terminate the employee, consider the following question:

*   Was the employee informed in writing of the rule or policy related to this offense?

*   Has the employee been warned previously?

*   Was this warning in writing?

*   Do I have all the facts?

*   Was a final warning issued?

*   Should I check with the District Manager before taking action?

*   Have all employes guilty of this violation received the same penalty?

Documentation

Employees are legally entitled to fair treatment. In the event of an arbitration dispute, it is frequently the employer who must present evidence to support their actions. This evidence comes in the form of written warnings, reviews, and/or termination reports. Without <u>written</u> support, judgments frequently are rendered in the employee's favor.

Make certain that you document any disciplinary actions taken or problems experienced with your employees. Be specific. "Failure to follow company policy" is not sufficient. What policy? Was the employee warned? Are your warnings signed by the employee as well as the Zone Manager?

Be thorough, be fair, and be professional. Disciplining for results is a skilled activity.

Although Herring indicated that he had counseled Stark on prior occasions, the August 15, 1984 employee counseling report indicates that it was the initial counseling session. Stark denied that there was prior counseling.

Herring also testified that an employee does not have the right to refuse to sign a counseling report he or she deems incorrect. Stark indicated that company policy allowed

an employee to refuse to sign an inaccurate or unfair report. The testimony of Alan Brown, Circle K's personnel expert, and Jim Estes, a Circle K employee and Stark's former supervisor, tends to support Stark's position.

Stark also testified that other zone managers had inventory shortages in excess of $2,000 for two or more months without receiving an employee counseling report. The evidence confirmed Stark's testimony. Those managers were also located within the Great Falls District.

Near the end of Stark's case in chief, Joseph Kasperick, a business and economics professor at Montana Tech, testified concerning Stark's damages. Professor Kasperick testified, inter alia, that his calculations were based on national and state data concerning average work life, interest rates, price increases, and cost of living increases; that he had interviewed Stark; that he had examined Stark's tax records and pay slips; that his calculations were based on the assumption that Stark would live to the end of his expected work life and that he would have held a job with similar pay; that the present value of the future difference between what Stark would have made and what he would make based on his current earnings is approximately $146,000; that Stark had suffered approximately $40,000 in foregone income to date; and that economic predictions were not exact. Counsel for Circle K did not object to Professor Kasperick's conclusions. Professor Kasperick was cross-examined by counsel and damages were argued during closing argument. Stark also presented an employment expert who testified similar jobs were not available in the Butte area.

Following the adverse jury verdict, Circle K moved for a judgment notwithstanding the verdict and a new trial. Both motions were denied. This appeal followed.

Circle K contends that there was insufficient evidence to support a finding of breach of the implied covenant of good faith and fair dealing. Thus, it is alleged the District Court improperly denied the motion for a judgment notwithstanding the verdict.

The standard of review is stringent. "The courts will exercise the greatest self-restraint in interfering with the constitutionally mandated processes of jury decision." Barmeyer v. Montana Power Co. (1983), 202 Mont. 185, 191, 657 P.2d 594, 597. A judgment notwithstanding the verdict is proper only where the evidence presented demonstrates a complete absence of proof in support of the prevailing party. Jacques v. Montana National Guard (1982), 199 Mont. 493, 504, 649 P.2d 1319, 1325. When examining the sufficiency of the evidence, the evidence and all inferences therefrom will be considered in a light most favorable to the prevailing party. Kukuchka v. Ziemet (Mont. 1985), 710 P.2d 1361, 1363, 42 St.Rep. 1916, 1917. A court will not substitute its judgment for that of the jury. Evidence may be inherently weak and still be sufficient to uphold the jury verdict. Anderson v. Jacqueth (Mont. 1983), 668 P.2d 1063, 1064, 40 St.Rep. 1451, 1453.

Circle K contends the contractual provision providing that Stark could be terminated "with or without cause" overcomes this heavy burden and precludes a finding of breach of good faith and fair dealing. It is alleged that the written contractual provision allowing termination without cause cannot be modified by oral representations which would give rise to a reasonable expectation of anything but "at will" employment. Circle K misunderstands the nature of good faith and fair dealing.

In Gates v. Life of Montana Insurance Co. (1982), 196 Mont. 178, 638 P.2d 1063 (Gates I), we recognized that the

covenant of good faith and fair dealing is applicable to employment contracts. The covenant is implied as a matter of law based on the public policy of this State. It does not depend on contractual terms for its existence, nor is the covenant of good faith and fair dealing subject to contractual waiver, express or implied. See § 28-2-701(2), MCA. "The duty arises out of the employment relationship yet the duty exists apart from, and in addition to, any terms agreed to by the parties." Gates v. Life of Montana Insurance Co. (Mont. 1983), 668 P.2d 213, 214, 40 St.Rep. 1287, 1289 (Gates II). Despite the express contract, the question of whether the "covenant of good faith and fair dealing is implied in a particular case depends upon objective manifestations by the employer giving rise to the employee's reasonable belief that he or she has job security and will be treated fairly." Dare v. Montana Petroleum Marketing Co. (Mont. 1984), 687 P.2d 1015, 1020, 41 St.Rep. 1735, 1739.

The record demonstrates Stark experienced objective manifestations reasonably giving rise to a belief of job security. Circle K repeatedly acknowledged Stark's positive input to the company. Stark received several promotions; his wages increased from minimum wage to $20,000 per year including benefits; he consistently received positive job evaluations; he was deemed "an asset to the company"; the company guide book indicated that generally employees should be terminated only after attempts to correct deficiencies; and Alan Brown indicated that Stark was a permanent employee. We find the evidence considerably more than sufficient for the jury to find that Stark had an objectively reasonable belief that he would be fired only for good cause.

In the alternative, Circle K argues that good cause did exist to fire Stark. Implicit in Circle K's argument is the

contention that an employer's determination of "good cause" is not subject to review by the jury. Circle K argues that the jury cannot decide "whether Herring's instructions [were] fair or unfair, necessary or unnecessary;" that Stark must blindly obey the commands of a superior. We disagree.

The implied covenant of good faith and fair dealing is designed to prevent the abuses of unfettered discretion inherent in a situation of unequal bargaining power. Dare, 687 P.2d at 1020, 41 St.Rep. at 1740. An employee is not required to leap at his masters every command. See Delaney v. Taco Time International (Ore. 1984), 681 P.2d 114 (employee wrongfully terminated for refusal to sign false report concerning fellow employee); Wagenseller v. Scottsdale Memorial Hospital (Ariz. 1985), 710 P.2d 1025 (hospital employee stated cause of action following discharge for refusal to take part in skit in which buttocks are exposed); Tameny v. Atantic Richfield Co. (Cal. 1980), 610 P.2d 1330 (employee who refused to participate in gasoline price-fixing wrongfully discharged); O'Sullivan v. Mallon (N.J. 1978), 390 A.2d 149 (x-ray technician cannot be discharged for refusal to perform catheterizations when the law requires such procedures be performed by a registered nurse or doctor); Trombetta v. Detroit, Toledo & Ironton R. Co. (Mich. 1978), 265 N.W.2d 385 (recognizing potential cause of action for wrongful discharge resulting from refusal to falsify pollution control reports); and Peterman v. International Brotherhood of Teamsters (Cal. 1959), 344 P.2d 25 (employee cannot lawfully be discharged for refusal to commit perjury). We will not require an employee to sign a written statement he believes to be false so that an employer can later justify termination. An "employee is entitled to some protection from injustice." Gates I, 196 Mont. at 184, 638 P.2d at 1067. Although an employer is entitled to latitude in making

- 10 -

business decisions, that latitude cannot be used as a facade to justify a breach of the covenant good faith and fair dealing. To rebut Stark's allegation, Circle K need only have shown a fair and honest reason for termination. Flanigan v. Prudential Federal Savings and Loan Assoc. (Mont. 1986), 720 P.2d 257, 43 St.Rep. 941.

Circle K apparently failed to do so, however. Contrary to Circle K's assertion, the jury, as the trier of fact, does determine whether good cause existed. Flanigan, 720 P.2d at 261, 43 St.Rep. at 946, Dare, 687 P.2d at 1019, 41 St.Rep. at 1739. The jury is not bound by the employers explanation. See Flanigan, supra (employee allegedly terminated as part of reduction in force); Crenshaw v. Bozeman Deaconess Hospital (Mont. 1984), 693 P.2d 487, 41 St.Rep. 2251 (employee allegedly terminated for disrupting continuity of care, continually getting in the way of patient care, disorderly conduct, breach of confidentiality, etc.); Dare, supra (employee allegedly terminated for refusing to clean designated areas, having men hang around the station, closing the station early, coming in late, and lack of responsibility). The cases above indicate that the proffered reason does not always conform to the evidence.

In the instant case, Herring's apparent lack of candor may have caused the jury to disbelieve Circle K's entire explanation. The record demonstrates that Herring was impeached on several matters, that his testimony conflicted with prior testimony given at an unemployment compensation hearing, and that his testimony conflicted with the documentary evidence. This situation led Judge Davis to comment:

> [Herring] was not a very good witness. I was restless and twisting in my chair at the way he responded. I am wondering how that may have affected the jury.

Circle K contends that the inconsistencies in Herring's testimony were only matters of opinion and not fabrication. We need not reach the issue. The jury as trier of fact, determines the credibility of a witness and the reason for termination. Flanigan, 720 P.2d at 261, 43 St.Rep. at 946. Herring's "apparent" lack of credibility is sufficient for the jury to find Circle K did not have a "fair and honest reason for termination." Flanigan, supra. The jury also could have found that Circle K failed to follow company policy as set forth in the Zone Managers Guide. We hold there is sufficient credible evidence to support the jury verdict.

Circle K also contends the award of compensatory damages is excessive and speculative because Professor Kasperick and the jury improperly assumed Stark would have remained with Circle K the remainder of his work life. We disagree.

The standard of review for reversal requires a finding that the jury award is so grossly out of proportion as to shock the conscience. Frisnegger v. Gibson (1979), 183 Mont. 57, 598 P.2d 574. Where it appears that the jury did not act arbitrarily or capriciously, its decision on the amount of damages must stand. The litigants agree that the jury determined the amount of damages based on the testimony of Professor Kasperick. We do not find such a method of determination to be arbitrary or capricious.

Section 27-1-203, MCA, provides that "damages may be awarded . . . for detriment . . . certain to result in the future." However, no person can foretell the future. In Frisnegger, we construed § 27-1-203 to require that damages need only be reasonably certain.

> While no case in Montana has construed this statute, it has always been the practice in Montana to instruct juries that future damages need only be reasonably certain, and not absolutely certain as

the statute seems to imply. In holding, as we do, that future damages need only be reasonably certain under the evidence, it must be granted that in determining an award for future damages, a jury, or an expert testifying on the subject, must to some degree engage in conjecture and speculation. When the conjecture and speculation is based upon reasonably certain human experience as to future events, the jury or trier of fact is entitled to rely on that degree of reasonable certainty in fixing and awarding future damages.

183 Mont. at 71, 598 P.2d at 582.

The record demonstrates that compensatory damages, as awarded by the jury, were "reasonably certain" within the meaning of Frisnegger. Professor Kasperick properly relied upon state and national data, Stark's records and interviews with Stark to derive input for his calculations. See Rule 703, M.R.Evid. (expert may base opinion upon facts or data made known to him at or before the hearing). Professor Kasperick then stated his conclusions and engaged in an exhaustive explanation of his methodology. The fact that Professor Kasperick relied upon Stark's hearsay statement that he planned to stay with Circle K is not dispositive. See Azure v. City of Billings (1979), 182 Mont. 234, 596 P.2d 460 (expert may rely upon facts that would not be admissible by themselves because they constituted hearsay). It is not unusual for a person who has found success in a chosen profession to remain with a company until retirement. The jury, as trier of fact, apparently agreed.

Circle K argues, in effect, that an award of 28 years lost income is per se excessive. We disagree. It is self-evident that the purpose of damages is to make an injured party whole. Stark presented evidence that similar work was not available in the Butte area and the amount of income he had lost as a result. Stark's evidence went substantially unrebutted.

- 13 -

Circle K did not object to Professor Kasperick's conclusion nor did it present its own expert on damages or employment opportunity. Circle K had the opportunity to cross-examine Professor Kasperick and to argue the amount of damages in closing argument. Jury instructions 7, 25 and 26 informed the jury they were not to speculate and should only award reasonable damages. Under these circumstances, we do not find 28 years to be per se excessive. Stark presented sufficient credible evidence for the jury to find he would not be able to find comparable employment in Butte. We will not substitute our judgment for that of the jury. As the District Court indicated, "it would be the height of judicial arrogance [for the court] to substitute its own findings and beliefs for those [of the] tried and true women of the jury."

The third issue before the Court concerns the admission into evidence of an economic damages summary. Following settlement of instructions, counsel for Stark moved to reopen his case-in-chief and offered an economic damages summary into evidence. The document was admitted over Circle K's objection that testimony had closed.

It has long been the rule in Montana that the propriety of a motion to reopen the case is left to the sound discretion of the trial court. Alderson v. Marshall (1888), 7 Mont. 288, 16 P. 576; Cole v. Helena Light & Railway Co. (1914), 49 Mont. 443, 143 P. 974; Brange v. Bowen (1920), 57 Mont. 77, 186 P. 680. No rigid nor fixed formula can or should be employed to determine when a motion to reopen is proper. The trial court, which has a feel for the case, can best determine what is necessary and appropriate to achieve substantial justice. Absent a clear abuse of discretion, the determination of the trial court will be upheld. Alderson, supra.

In the instant case, the material contained within the economic damages summary had been thoroughly presented during Stark's case-in-chief. Circle K was not unduly surprised by its contents. We find no abuse of discretion. See Brange, supra.

Finally, Circle K contends there is an absence of proof to support a verdict granting Stark punitive damages against Circle K and therefore a judgment notwithstanding the verdict should have been granted. We find there is sufficient credible evidence to uphold the jury verdict.

At the time in question, § 27-1-221, MCA, (1983), provided that punitive damages may be awarded where "the defendant has been guilty of oppression, fraud, or malice, actual or presumed . . ." In Flanigan, we recognized that the jury can infer malice from a lack of candor on the part of the employer. 720 P.2d at 265, 43 St.Rep. at 951. The apparent lack of candor on the part of Herring is sufficient for the jury to have inferred malice.

The judgment of the District Court is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

- 15 -

Mr. Justice L. C. Gulbrandson, dissenting.

I respectfully dissent.

The majority, in affirming the award of $200,000 compensatory damages to include 28 years of lost income in the future, and $70,000 punitive seems to rely mainly on (a) objective manifestations of job security for Stark, (b) evidence of inaccurate inventory figures used by Herring, and (c) lack of candor by Herring to infer malice sufficient to justify the punitive damage award.

Any objective manifestations of job security given Stark by way of positive write-ups, promotions and salary increases were prior to the inventory shortages arising in the spring of 1984. From that time, until termination on August 22, 1984, there were no positive write-ups, commendations, or salary increases for Stark, but there were meetings, counsellings, and discussions regarding the serious matter of major inventory shortages in the district. The inventory shortages supplied to Herring, as District Manager, indicated that Stark had the worst inventory shortages of any zone manager in Herring's district. The actual inventory figures, for Stark's zone, supplied to Herring were: April -- $3,469.19 short; May -- $608.70 overage; June -- $1,340.44 short; July -- $3,244 short; and preliminary August figures -- $6,750 short. The September overages obviously were not available until after Stark's refusal to sign the employee counseling report and subsequent termination on August 22. The majority opinion overlooks the fact that Stark was present during the inventories, made no objection to the figures, signed the inventories, and failed to implement the control inventory procedure if he thought the inventory figures were incorrect, even though he had participated in twenty-three inventories as a manager. The manner in which

16

Stark was discharged, in my opinion, did not indicate any basis to submit the issue of punitive damages to the jury. The record is clear that both meetings between Herring and Stark took place in a private, secluded place with no other persons present. The discussions were limited to control of inventories and the request that Stark sign the counselling report. Herring testified that no other Circle K employee or manager had ever refused his request to sign the counselling report and the evidence is clear that Stark drafted similar reports and required that his subordinates sign them. The fact that Herring had Stark's final paycheck with him at the second meeting cannot, in my opinion, be used to infer malice justifying punitive damages. Herring testified that had Stark signed the counselling report upon the second request, Stark would not have been terminated, but, in anticipation that Stark might again refuse to sign, he had the check prepared because he thought he had to deliver an employee's final check within 24 hours. Section 39-3-205(2), MCA, is as follows:

> (2) When an employee is separated for cause from employment by the employer, all the unpaid wages of the employee shall become due and payable immediately upon such separation.

Section 39-3-206, MCA, provides the following penalties for failure to comply with § 39-3-205:

> Any employer, as such employer is defined in this part, who fails to pay any of his employees as provided in this part or violates any other provision of this part shall be guilty of a misdemeanor. A penalty shall also be assessed against and paid by such employer and become due such employee as follows: a sum equivalent to the fixed amount of 5% of the wages due and unpaid shall be assessed for each day, except Sundays and

17

legal holidays, upon which such failure continues after the day upon which such wages were due, except that such failure shall not be deemed to continue more than 20 days after the date such wages were due.

It seems that a Catch-22 situation has been created when an employer, attempting to comply with a statute to avoid a misdemeanor conviction and a doubling of wages due an employee, can have evidence of said attempts at payment used against him to justify an award of punitive damages.

The transcript of the final oral argument of plaintiff's counsel includes the following:

[L]ike Mr. Milodragovich said, you've got to send a message to Phoenix, you've got to tell these people that in Butte, Montana, you've got to follow your policies because that is what the law says. These people only understand money. That is all they understand is money. That is the bottom line. That is why they are in business. There is an exhibit in here that says that the gross sales of Circle K Corporation is 1.6 Billion Dollars. Big, big company. It says here that the net worth is 122 Million Dollars. Now, I would think that if a Million dollars was had to be paid by this company that they would get it right the next time. That they wouldn't push people around. That they would admit that they did things wrong. That is the only way that you are ever going to teach these people what they are doing. It's like sending a message to Phoenix just like Mr. Milodragovich said.

You know what the crowning glory is in this case? It's that Cheryl Wellnitz came down from Great Falls with Mr. Herring on the 22nd to drive Greg Stark's car back. He knew he was going to terminate Greg Stark on the 22nd. It wasn't that he gave him another

18

> opportunity to sign that report. He was getting rid of him. He didn't want to check into any information. He was getting rid of him. His final pay check was made out. He had that with him. If he didn't intend to fire him, what did he have the final pay check for? . . .

In my opinion, the issue of punitive damages should not have been allowed, over objection, to be considered by the jury, and the trial judge should have so ruled, based upon the evidence presented.

The failure of the trial judge to dismiss the punitive damages claim, and the subsequent refusal to enter judgment n.o.v., or to grant a new trial, in my view, constitutes reversible error.

By allowing evidence of the defendant's company's gross sales of over 1.5 billion dollars and a net worth of over 122 million dollars, the entire trial was contaminated with highly prejudicial, but wholly irrelevant, evidence.

I would therefore reverse the judgment entered and would remand for a new trial on the issue of breach of the covenant of good faith and compensatory damages, if any.

_____
Justice

Mr. Justice John Conway Harrison joins in the forgoing dissent of Mr. Justice L. C. Gulbrandson.

_____
Justice

Mr. Chief Justice J. A. Turnage concurs in the foregoing dissent of Mr. Justice L. C. Gulbrandson.

_____
Chief Justice

19