

DA 12-0094

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 1

BOYNE USA, INC.,

       Plaintiff and Appellee,

   v.

SPANISH PEAKS DEVELOPMENT, LLC,
LONE MOUNTAIN HOLDINGS, LLC
and JOHN DOES 1-5,

       Defendants and Appellants.

APPEAL FROM:    District Court of the Fifth Judicial District,
                    In and For the County of Madison, Cause No. DV 29-2008-8
                    Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           Stephen R. Brown; Charles E. McNeil; Elena J. Zlatnik; Garlington, Lohn
           & Robinson, PLLP, Missoula, MT

      For Appellee:

           David M. Wagner, Crowley Fleck PLLP, Bozeman, MT

                     Submitted on Briefs:  September 26, 2012
                                Decided:  January 2, 2013

Filed:

                    _____
                                Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Boyne USA, Inc. (Boyne) filed an action for breach of contract against Blixseth Group, Inc. that covered a land sale for 15 acres of property on Lone Peak in Madison County, Montana. Boyne sought specific performance. Boyne joined Yellowstone Mountain Club, LLC as a party due to Yellowstone Mountain Club's acquisition of the contested property.

¶2 Yellowstone Mountain Club purportedly conveyed the contested 15-acre Lone Peak property to Spanish Peaks Development, LLC (SPD). Boyne joined SPD as a party. SPD, in turn, conveyed the 15-acre Lone Peak property to Lone Mountain Holdings, LLC (LMH). Boyne joined LMH as a party. Boyne further alleged abuse of the legal process and deceit. The District Court dismissed Blixseth Group and Yellowstone Mountain Club from the case on January 15, 2010, due to Yellowstone Mountain Club's bankruptcy.

¶3 The jury awarded Boyne $300,000 from each defendant based on its determination that SPD and LMH had deceived Boyne and had abused the legal process. The District Court awarded Boyne specific performance on the Peak Agreement. The District Court also awarded attorney fees to Boyne. SPD and LMH appeal and we affirm subject to one minor modification. (*See* ¶ 70). We will refer to SPD and LMH collectively as "Appellants" when we address their claims on appeal.

¶4 Appellants raise the following issues on appeal:

¶5 *1. Whether the District Court properly awarded specific performance to Boyne.*

¶6 *2. Whether the jury properly awarded compensatory damages to Boyne.*

2

¶7    *3. Whether the District Court properly awarded legal fees to Boyne pursuant to the terms of the contract.*

¶8    *4. Whether Boyne is entitled to legal fees on appeal.*

PROCEDURAL AND FACTUAL BACKGROUND

¶9    The dizzying array of land transfers, assignments, and corporate metamorphoses leads us to prepare a program to identify the players:

| BLS | Blixseth's & McDougal brothers' entities; owned checker-boarded land that it exchanged with the U.S. for the Lone Peak property; entered into the Peak Agreement with Boyne. |
| --- | --- |
| Yellowstone Mountain Club | Entity managed by Dolan & Blixseth; owned the Lone Peak property and transferred it to SPD. |
| Spanish Peaks Development (SPD) | Entity managed by Dolan and Blixseth. |
| Spanish Peaks Holding (SPH) | Entity owned by SPD; managed by Dolan and Blixseth. |
| Lone Mountain Holdings (LMH) | Entity owned and managed by Dolan and his family; purchased the Lone Peak property from SPD. |
| Peak Agreement | Boyne receives Lone Peak land in return for 4 items of consideration that included transfer of land under the Southfork Agreement. Boyne entered into the Peak Agreement with BLS; BLS transferred its rights to SPD. |
| Southfork Agreement | Boyne transfers 25 acres of land as partial consideration for the Peak Agreement. Boyne entered into the Southfork Agreement with McDougals; McDougals transferred their rights to SPD; SPD transferred its rights to SPH. |

3

¶10     The United States Forest Service (U.S.) decided to consolidate lands in the Gallatin National Forest pursuant to the Gallatin Land Consolidation Act of 1998, Pub. L. No. 105-267, 112 Stat. 2371.  Consolidation would make these lands easier for the U.S. to manage. Blixseth Group and two other entities, LeeLynn, Inc., and Wiley Mt., Inc., (collectively BLS), owned checker-boarded lands in the Gallatin National Forest that the U.S. wished to acquire.  The U.S. entered into an agreement with BLS to exchange BLS lands for certain federal lands, including 15 acres of federal land at the top of Lone Peak.

*The Peak Agreement*

¶11     BLS contracted to sell this Lone Peak property to Boyne through the Peak Agreement. Boyne owns and operates Big Sky Resort.  Boyne intended to use the Lone Peak property as part of its ski resort.  Boyne and BLS finalized the Peak Agreement on September 30, 1998. The Peak Agreement provided that BLS would transfer the property to Boyne if BLS were successful in obtaining the Lone Peak property from the U.S.

¶12     The Peak Agreement required Boyne to perform four obligations as consideration for its receipt of the Lone Peak property.  First, Boyne would not challenge the U.S.'s decision to transfer the property to BLS.  Second, Boyne would pay for a survey of the Lone Peak property.  Third, Boyne would exchange 25 acres of Boyne's property with the McDougal brothers for the first half of the Lone Peak property, pursuant to a separate agreement, the Southfork Agreement.  The Peak Agreement referred to the McDougal brothers because two brothers, Mel and Norm McDougal, owned LeeLynn, Inc. and Wiley Mt., Inc., two of the three entities that comprised BLS.  Fourth, Boyne would pay cash to the Blixseth Group for the second half of the Lone Peak property.  The parties estimated the Lone Peak property's

4

value at $800 per acre. Boyne agreed to pay the appraised price of the property when the U.S. and BLS exchanged lands.

*The Southfork Agreement*

¶13 McDougals owned nine hundred acres of property, Southfork, situated south of Boyne's property. McDougals planned to develop Southfork into Spanish Peaks Resort. McDougals wanted ski in/ski out access to Big Sky Resort's chairlifts. Ski in/ski out access would increase the value of McDougals' planned Spanish Peaks Resort. Boyne owned the property between the planned Spanish Peaks Resort and the nearest chairlift at Big Sky Resort.

¶14 McDougals and Boyne finalized the Southfork Agreement in September 1998. The Southfork Agreement required Boyne to transfer 25 acres of Boyne's property to McDougals. The parties did not identify the exact location of the property to be transferred because McDougals had not yet designed Spanish Peaks Resort. The parties understood, however, that Boyne would transfer property that would provide McDougals ski in/ski out access for Spanish Peaks Resort to Big Sky Resort. McDougals agreed to pay an override fee to Boyne for each property that McDougals sold at Spanish Peaks Resort that would have ski in/ski out access to Big Sky Resort's chairlifts.

*Assignment of Peak Agreement and Southfork Agreement*

¶15 James Dolan (Dolan) and Tim Blixseth (Blixseth) co-managed SPD. SPD purchased the property that the McDougal brothers had been planning to develop as the Spanish Peaks Resort. The McDougal brothers then assigned their rights under both the Peak Agreement and the Southfork Agreement to SPD on September 5, 2000. The Southfork Agreement

5

required Boyne to transfer the 25 acres that would facilitate ski in/ski out access for Spanish Peaks Resort. The third party to the Peak Agreement, Blixseth Group, managed by Blixseth, also assigned its rights under the Peak Agreement to SPD. These assignments left SPD as the sole beneficiary of both the Peak Agreement and the Southfork Agreement.

¶16 Dolan and Blixseth formed Spanish Peaks Holding (SPH) in 2002. The same two also managed SPH. SPH purchased the McDougals' Spanish Peaks Resort property from SPD. SPD then assigned its interest in the Southfork Agreement to SPH. SPD maintained its interest in the Peak Agreement.

| Original Parties to Peak Agreement (1998) | Blixseth Group & McDougal Brothers |
|---|---|
| Transfer of McDougals' rights (2000) | McDougal Brothers to SPD |
| Transfer of Blixseth Group's rights (2000) | Blixseth Group to SPD |
| Final party with all rights to Peak Agreement | SPD |

| Original Party to Southfork Agreement (1998) | McDougal Brothers |
|---|---|
| Transfer 1 (2000) | McDougal Brothers to SPD |
| Transfer 2 (2002) | SPD to SPH |
| Final party with all rights to Southfork Agreement | SPH |

*The Purchase and Sale Agreement*

¶17    SPH, Boyne, and a third entity, Blue Sky Ridge, LLC, entered into a Purchase and Sale Agreement on March 30, 2002. Blixseth and Dolan owned and controlled Blue Sky Ridge. SPH and Blue Sky Ridge purchased approximately 1,734 acres of property from Boyne as part of the Purchase and Sale Agreement. SPH and Blue Sky Ridge paid $7 million to Boyne for this property.

¶18    The Purchase and Sale Agreement also modified the Southfork Agreement to limit the property at Spanish Peaks Resort for which Boyne would receive override fees. Boyne also agreed to upgrade the Southern Comfort chairlift at Big Sky Resort on a different schedule than originally contemplated in the Southfork Agreement. Boyne agreed further to forfeit override fees if Boyne failed to upgrade the Southern Comfort chairlift according to the new accelerated schedule.

¶19    All parties agree that Boyne transferred the 25 acres needed to facilitate ski in/ski out access as described in the Southfork Agreement as part of this Purchase and Sale Agreement. Appellants contend that Boyne actually sold these 25 acres, along with the other property, and received $7 million in return. Boyne agrees that the transfers occurred at the same time. Boyne argues, however, that the $7 million did not include any payment for the 25 acres.

¶20    Boyne suggests that the $7 million constituted payment for SPH and Blue Sky Ridge's purchase of the 1,734 acres of property from Boyne. SPH requested that the transfers occur at the same time to simplify the property transaction for SPH. The Southfork Agreement and the Purchase and Sale Agreement transferred contiguous parcels. The transfer of the Southfork Agreement property to SPH at the same time as the property

7

transfer under the Purchase and Sale Agreement apparently allowed SPH to evade subdivision review.

*Boyne's Alleged Breaches of Contract*

¶21 The U.S. issued a patent to BLS for the Lone Peak property on August 23, 2004. BLS conveyed the Lone Peak property to Yellowstone Mountain Club on December 21, 2004. Dolan and Blixseth co-managed Yellowstone Mountain Club. Blixseth informed Boyne on January 1, 2005, that Yellowstone Mountain Club would not transfer the Lone Peak property to Boyne as originally contemplated in the Peak Agreement.

¶22 Blixseth and Dolan's lawyer, Mike Doyle (Doyle), informed Boyne in January 2005, for the first time, that Boyne had breached the Southfork Agreement by not upgrading the Southern Comfort chairlift quickly enough. Doyle claimed that Boyne's breach of the Southfork Agreement would deprive Boyne of the 15-acre Lone Peak property. Boyne points out that its upgrade of the Southern Comfort chairlift never figured into the consideration for receiving the Lone Peak property. Boyne argues that Appellants fabricated this illusory breach as a pretext to withhold the Lone Peak property.

¶23 Doyle told Boyne in February 2005 that Boyne also had breached the Southfork Agreement by its sale to SPH in 2002 of the 25 acres of Boyne's property identified in the Southfork Agreement. Doyle informed Boyne that Boyne should have transferred the 25 acres to SPD. Boyne instead, at the request of SPH, had transferred the 25 acres to SPH, a different entity owned by SPD and managed by Dolan and Blixseth. Doyle insisted that Boyne transfer an additional 25 acres of Boyne's property to SPD before Boyne would receive the Lone Peak property.

¶24 Nobody had suggested to Boyne before February 2005 that its transfer of the 25 acres to SPH had breached the Southfork Agreement. In fact, Boyne believed that its transfer of the 25 acres had fulfilled Boyne's obligation under the Southfork Agreement. SPD had assigned its interest in the Southfork Agreement to SPH in 2002. Boyne further believed that it had transferred the property to SPH, rather than separately having sold it, as Doyle suggested.

¶25 Boyne alleged at trial that Doyle, Blixseth, and Dolan had fabricated this breach of contract issue to pressure Boyne to discount or eliminate the override fees that SPH owed to Boyne for the ski in/ski out access afforded to Spanish Peaks Resort. The override fees for the ski in/ski out access that Boyne had provided to SPH were due in February 2005. Boyne alleged that Doyle, Blixseth, and Dolan manufactured this alleged breach in February 2005 solely to force Boyne to modify the override fees.

*Boyne Files Complaint*

¶26 Boyne filed a complaint against Blixseth Group and Yellowstone Mountain Club on January 29, 2008. Yellowstone Mountain Club conveyed the Lone Peak property to SPD on February 7, 2008. Boyne added SPD as a party on February 20, 2008. Dolan and his family created a new entity, LMH, on November 25, 2008. SPD conveyed the Lone Peak property to LMH on December 22, 2008. Boyne added LMH as a party on August 28, 2009. Boyne further sought damages for Appellant's abuse of the legal process and deceit. The District Court dismissed Blixseth Group and Yellowstone Mountain Club from the case on January 15, 2010, due to Yellowstone Mountain Club's bankruptcy.

¶27 The District Court conducted a five-day jury trial in November 2010. The jury decided the legal claims that Boyne presented, including the breach of contract and damages issue, and issued advisory judgments on Boyne's equitable claims. The jury determined that SPD had breached the Peak Agreement with Boyne. The jury also determined that SPD and LMH each had deceived Boyne and had abused the legal process. The jury awarded Boyne $300,000 from SPD and $300,000 from LMH as compensatory damages. The jury also awarded $1 in punitive damages. The District Court, acting as a court of equity, awarded Boyne specific performance on the Peak Agreement and ordered LMH to transfer the Lone Peak property to Boyne. The District Court also awarded attorney fees to Boyne pursuant to a provision in the Peak Agreement. SPD and LMH appeal.

STANDARD OF REVIEW

¶28 We review for clear error a district court's findings of fact. *Pastimes, LLC v. Clavin*, 2012 MT 29, ¶ 18, 364 Mont. 109, 274 P.3d 714. Clear error exists if substantial credible evidence fails to support the findings of fact, if the district court misapprehended the evidence's effect, or if we have a definite and firm conviction that the district court made a mistake. *Pastimes*, ¶ 18. We review for correctness a district court's conclusion of law. *Varano v. Hicks*, 2012 MT 195, ¶ 7, 366 Mont. 171, 285 P.3d 592.

¶29 We review a jury's verdict for substantial credible evidence. Evidence that a reasonable mind might accept as adequate to support a conclusion qualifies as substantial credible evidence. *Seltzer v. Morton*, 2007 MT 62, ¶ 94, 336 Mont. 225, 154 P.3d 561.

¶30 We review for abuse of discretion an award of attorney fees. *Tripp v. Jeld-Wen, Inc.*, 2005 MT 121, ¶ 12, 327 Mont. 146, 112 P.3d 1018. A district court abuses its discretion

10

when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason resulting in substantial injustice. *Tripp*, ¶ 12.

DISCUSSION

¶31    *1. Whether the District Court properly awarded specific performance to Boyne.*

¶32    Appellants appeal the District Court's award of specific performance of the Peak Agreement to Boyne. Appellants correctly note that Boyne must have performed its obligations under the contract in order to be eligible for specific performance. *Baker v. Berger*, 265 Mont. 21, 29, 873 P.2d 940, 944-45 (1994); § 27-1-416, MCA. Appellants argue that Boyne failed to meet two of Boyne's four contractual obligations, and, therefore, Boyne remains ineligible for the equitable award of specific performance.

¶33    All parties agree that Boyne fulfilled its first contractual obligation: not to contest the U.S.'s decision to exchange the Lone Peak property with BLS. All parties also agree that Boyne fulfilled its contractual obligation to pay for the survey when Boyne retained Gaston Engineering in 1999 to survey the Lone Peak property. We address whether Boyne fulfilled its final two obligations under the Peak Agreement.

*A. Exchange of Property Under the Southfork Agreement*

¶34    The Peak Agreement's third contractual obligation required Boyne to "exchange certain lands with McDougal" for the Lone Peak property. All parties agree that the Southfork Agreement enumerated all of the lands to be exchanged with the McDougal brothers. Boyne assuredly transferred the 25 acres described in the Southfork Agreement to SPH on March 30, 2002, as part of a bigger transaction under the Purchase and Sale

11

Agreement. Appellants argue, nevertheless, that Boyne's transfer of property failed to fulfill Boyne's contractual obligations under the Southfork Agreement.

*1. transfer to SPH instead of SPD*

¶35    Boyne originally had entered into the Southfork Agreement with the McDougal brothers. The McDougal brothers later assigned their rights under the Southfork Agreement to SPD. Appellants apparently accept the validity of the McDougals' assignment to SPD. Appellants argue that the Southfork Agreement required Boyne to transfer this property to SPD. Boyne instead transferred the property to SPH.

¶36    SPD earlier had transferred all right, title, and interest that it possessed under the Southfork Agreement to SPH through the Assignment and Assumption document. The Assignment and Assumption document provides that "Assignor [SPD] hereby assigns and transfers to Assignee [SPH] all right, title and interest of Assignor in, to and under the agreements and contracts described in Exhibit A attached hereto." Exhibit A includes the Southfork Agreement and the documents that assigned the McDougal brothers' rights under the Southfork Agreement to SPD.

¶37    Dolan, the manager of both SPH and SPD, admitted at trial that SPD had transferred the Southfork Agreement to SPH. Dolan further admitted that SPD retained no rights under the Southfork Agreement. The same people, Dolan and Blixseth, managed SPH and SPD. The same attorney, Doyle, represented both SPH and SPD. SPH, an entity owned by SPD, publicly represented in court filings in a different case that SPH had taken assignment of the Southfork Agreement.

¶38 Appellants do not address directly Boyne's claim that SPD had assigned its rights under the Southfork Agreement to SPH. During their closing argument, Appellants urged jurors to ignore the Assignment and Assumption agreement and made no attempt to explain it. Appellants seem to argue that the Assignment and Assumption agreement does not mean what it says and that SPD did not assign away its rights under the Southfork Agreement. Appellants simply claim that Boyne erroneously transferred the 25 acres to "another party" instead of transferring the property to SPD. Appellants argue that Boyne's transfer of the 25 acres to "another party" --SPH-- owned by SPD and managed by the same people as SPD, somehow breached the Southfork Agreement and therefore breached the Peak Agreement.

¶39 Appellants point to no evidence to suggest that SPD did not transfer all of its rights and obligations under the Southfork Agreement to SPH. The Assignment and Assumption document details this transfer of rights. Dolan admitted at trial that this transfer occurred and that SPD retained no rights under the Southfork Agreement. We decline Appellants' suggestion to suspend belief and ignore the clear transfer of its rights set forth in the Assignment and Assumption document. The record supports the District Court's finding that SPD had transferred all of its rights under the Southfork Agreement to SPH. *Pastimes*, ¶ 18.

¶40 Appellants next attempt to re-write the Peak Agreement and the Southfork Agreement. Appellants argue in their reply brief, apparently for the first time, that the Peak Agreement required Boyne to have transferred the 25 acres described in the Southfork Agreement to the party with rights under the Peak Agreement. Appellants criticize Boyne's "convoluted reliance" on Boyne's transfer of 25 acres pursuant to the Southfork Agreement to SPH, a party with no rights under the Peak Agreement. Appellants claim that "[t]he only

13

relevance of this second contract [the Southfork Agreement] was to identify 25 acres to be used for the exchange . . . . The Peak Agreement did not say anything such as 'this agreement is contingent upon performance of the other agreement' or anything that would make Boyne's arguments [that Boyne transferred 25 acres pursuant to the Southfork Agreement] valid."

¶41     Appellants' argument that the Southfork Agreement merely identified the exchange acres assumes, however, that the Peak Agreement and the Southfork Agreement do not identify the parties to whom Boyne was obligated to convey the 25 acres. They do. Boyne and three entities executed the Peak Agreement. One entity, Blixseth Group, was to receive a cash payment for half of the Lone Peak property. The other two entities, owned by the McDougal brothers, were to receive land described in a "separate agreement" for their half of the Lone Peak property.

¶42     Appellants quote the Peak Agreement to support their interpretation of the Southfork Agreement: "Boyne will exchange certain lands . . . for the remaining one half of the surveyed lands." Appellants conveniently omit key language from the Peak Agreement, however, that indicates the McDougal brothers were intended to receive the 25 acres under the Southfork Agreement as their half of the payment. "*Boyne will pay BGI [Blixseth Group] the referenced price for one half of the surveyed acreage.* Boyne will exchange certain lands *with McDougal* for the remaining one half of the surveyed lands. *The land to be exchanged in [sic] described in a separate agreement between Boyne and McDougal.*" (Emphasis added on Appellants' omitted words.)

14

¶43   The Southfork Agreement, the "separate agreement," also clearly identifies the McDougal brothers, referred to as "Southfork," as the party to receive the 25 acres. "Boyne will transfer to Southfork approximately 25 acres . . . ." The Southfork Agreement makes no mention of the Peak Agreement and nowhere states that Boyne must transfer these 25 acres to the party with rights under the Peak Agreement. Absolutely nothing in these two contracts suggests that the party with rights under the Peak Agreement represents the proper party to receive the 25 acres. The plain language of the two contracts confirms that SPH was to receive the 25 acres from Boyne.

¶44   Further, the terms of the Southfork Agreement establish a stand alone contract, rather than merely a description of the 25 acres to be transferred. The Southfork Agreement addresses numerous issues between the McDougal brothers and Boyne. These issues include Boyne's obligation to upgrade the Southern Comfort ski lift at Big Sky Resort as part of the effort to facilitate ski in/ski out access for Spanish Peaks Resort. The Southfork Agreement also addresses Boyne's obligation to pay $225,000 for a second chair lift that McDougals would build as part of the ski in/ski out access for Spanish Peaks Resort. In addition, the Southfork Agreement addresses the override fees that Boyne would receive on McDougals' property at Spanish Peaks Resort sold within walking distance of Big Sky Resort's ski lifts.

¶45   As a final matter, SPD owned SPH at the time that Boyne transferred the 25 acres to SPH. Dolan and Blixseth managed both SPH and SPD, and their attorney, Doyle, represented both entities. Nobody suggested to Boyne that Boyne transferred the 25 acres to the wrong entity in 2002. In fact, Dolan and Doyle repeatedly made representations to Boyne over the next three years that led Boyne to believe that both agreements were still in

good standing. The parties to the Southfork Agreement, rather than the parties to the Peak Agreement, were the proper party to receive the 25 acres. Boyne properly transferred the 25 acres to SPH.

*2. selling instead of exchanging property*

¶46 Appellants next argue, apparently in the alternative, that the Southfork Agreement required Boyne to "exchange" 25 acres of Boyne's property, but that Boyne instead "sold" this property to SPH. Boyne transferred the 25 acres to SPH in 2002 as part of a larger transfer of property described in the Purchase and Sale Agreement.

¶47 Boyne entered into the Purchase and Sale Agreement with two entities owned and controlled by Dolan and Blixseth: SPH and Blue Sky Ridge. SPH and Blue Sky Ridge paid Boyne $7 million under the Purchase and Sale Agreement. In return, Boyne sold 1,734 acres of property to SPH and Blue Sky Ridge. The Purchase and Sale Agreement nowhere discusses the transfer of the 25 acres described in the Southfork Agreement.

¶48 Moreover, subdivision review would have been necessary if Boyne had transferred the 25 acres independently. Section 76-3-103, MCA; § 76-3-104, MCA. Boyne's lawyer for the Purchase and Sale Agreement testified at trial that Boyne had transferred the 25 acres at the same time as the property transfer under the Purchase and Sale Agreement to help SPH evade subdivision review. SPD did not claim that Boyne had breached the Southfork Agreement until three years after Boyne had transferred the 25 acres. In the interim, SPH and SPD made statements to Boyne that indicated that all parties still believed that a valid contract existed and that SPD soon would transfer the Lone Peak property to Boyne.

16

¶49 Appellants point to no evidence to show that Boyne had "sold" the 25 acres rather than "exchanging" the 25 acres. Appellants point only to the timing of the transaction. The transaction occurred at the same time as the property transfer pursuant to the $7 million Purchase and Sale Agreement. Appellants make no effort whatsoever to address Boyne's claim that the exchange was done at the same time as the Purchase and Sale Agreement to help SPH evade subdivision review.

¶50 The District Court found that Boyne had exchanged the property, as required under the Southfork Agreement, rather than selling the property. The District Court noted that from 2002, when SPH received the property, to February 2005, SPD, Dolan, Blixseth, and Doyle did not claim that Boyne had breached the Peak Agreement or the Southfork Agreement by transferring the property to SPH. The District Court found that in 2004, SPD, SPH, and their lawyer made a number of representations to Boyne that were intended to, and did, leave Boyne with the impression that the Peak Agreement and Southfork Agreement were in good standing. The District Court further found that Boyne's transfer of the 25 acres of property to SPH in 2002 had fulfilled Boyne's obligation to transfer property under the Southfork Agreement.

¶51 Evidence in the record supports the District Court's findings. The District Court noted that SPH would have objected in 2002 if Boyne had breached the Southfork Agreement by requiring SPH to pay for the property, rather than waiting until 2005 to object. We cannot say that the District Court clearly erred in finding that Boyne had exchanged the 25 acres rather than having sold it. *Pastimes*, ¶ 18. This finding confirms that Boyne had fulfilled its third contractual obligation of exchanging 25 acres of property with SPH.

17

*B. Payment for Half of Lone Peak*

¶52 The fourth contractual condition required Boyne to pay for half of the Lone Peak property. Appellants claim that Boyne cannot seek specific performance for the Peak Agreement because Boyne failed to fulfill this fourth obligation. Boyne admits that it has not yet paid this money. Boyne claims, however, that the Peak Agreement did not obligate it to pay before it sought specific performance because SPD anticipatorily had breached the contract.

*1. anticipatory breach*

¶53 Boyne claims that SPD anticipatorily breached the Peak Agreement by requiring Boyne to perform an additional term not contained in the contract before SPD would transfer the Lone Peak property. Boyne argues that SPD's demand that Boyne transfer an additional 25 acres of property to SPD, after Boyne already had transferred 25 acres of property to SPH, constituted a demand to perform an additional term not contained in the Peak Agreement. SPD informed Boyne in 2005 that it would not transfer the Lone Peak property to Boyne unless Boyne fulfilled this additional term.

¶54 The District Court agreed that SPD's demand for Boyne to transfer an additional 25 acres constituted an additional term not contained in the contract. The District Court also found that SPH had made an unequivocal statement in 2005 that SPH would not transfer the Lone Peak property unless Boyne transferred an additional 25 acres of property. SPD informed Boyne that it would not transfer the Lone Peak property to Boyne even if Boyne paid for the Lone Peak property. Further, after it received title to the Lone Peak property, SPD transferred the property to LMH, a different entity managed by Dolan. This transfer

18

made it impossible for SPD to fulfill its contractual obligation to transfer the Lone Peak property to Boyne. The District Court concluded that SPD had anticipatorily breached the Peak Agreement.

¶55    The Peak Agreement and the Southfork Agreement required Boyne to transfer a single 25-acre parcel. SPD's demand for Boyne to transfer additional property represented a demand to fulfill a term not contained in the Peak Agreement. An anticipatory breach occurs if a party demands performance of a term not included in the contract and the party unequivocally states that it will not perform the contract unless the additional term is met. *Chamberlin v. Puckett Constr.*, 277 Mont. 198, 203, 921 P.2d 1237, 1240 (1996). The record supports the District Court's finding that Boyne had fulfilled its obligation to transfer 25 acres under the Peak Agreement in 2002. *Pastimes*, ¶ 18. The record further supports the District Court's finding that SPD made an unequivocal statement to Boyne in 2005 that Boyne must fulfill this additional term before SPD would transfer the Lone Peak property. SPD anticipatorily breached the contract. *Chamberlin*, 277 Mont. at 203, 921 P.2d at 1240.

*2. useless acts not required before seeking specific performance*

¶56    The District Court determined that Boyne could enforce the Peak Agreement without first fulfilling Boyne's final contractual requirement of paying SPD in light of SPD's repudiation of its contractual duty to transfer the Lone Peak property to Boyne. The District Court relied on *Eschenbacher v. Anderson*, 2001 MT 206, ¶¶ 35-36, 306 Mont. 321, 34 P.3d 87, for its conclusion that Boyne was not required to continue performing Boyne's contractual obligations before seeking specific performance. We review for correctness a district court's conclusion of law. *Varano*, ¶ 7.

19

¶57 Appellants claim that "Boyne can point to no Montana case law that says it is entitled to specific performance of a contract when it failed to provide the consideration . . . it was obligated to provide." Appellants ignore the District Court's citation of *Eschenbacher*. Incredibly, Appellants cite *Eschenbacher* for the opposite conclusion—that Boyne was required to perform fully Boyne's contractual obligations before it could seek specific performance.

¶58 Appellants correctly recognize that "*Eschenbacher* supports the proposition that a party may bring an action to enforce a contract if the other party has anticipatorily breached." Appellants claim that Boyne would receive a windfall if Boyne were not required to perform fully Boyne's contractual duties before bringing this action for specific performance. Appellants dismiss the notion that SPD's "so-called anticipatory breach somehow excused Boyne's further performance under the Agreement."

¶59 Appellants highlight one sentence from *Eschenbacher* for the proposition that Boyne must perform fully Boyne's contractual duties before it requests specific performance. "Before a party may require another party to perform under an obligation, the requesting party must fulfill all conditions precedent required of the requesting party." *Eschenbacher*, ¶ 35. The following two sentences of *Eschenbacher* clearly indicate that Boyne did not need to perform fully before it could seek specific performance in light of Appellants' anticipatory breach of the contract. *Eschenbacher*, ¶ 35. *Eschenbacher* emphasizes that the law does not require a party to an agreement to perform a useless act: "If a party to a contract repudiates his contractual duty prior to his obligation to perform, the other party may enforce the

20

obligation without performing or offering to perform any of her obligations." *Eschenbacher*, ¶ 35.

¶60 Boyne may bring its action for specific performance of the Peak Agreement even though Boyne has not yet fulfilled its last contractual obligation to pay SPD for the Lone Peak property. *Eschenbacher*, ¶ 40. We do not require Boyne first to perform the useless act of paying SPD when SPD already anticipatorily has breached the Peak Agreement. *Eschenbacher*, ¶ 35. The District Court properly applied the law of anticipatory breach.

*3. value of the Lone Peak property*

¶61 Appellants further argue against specific performance due to the lack of a price term specified in the contract. The Peak Agreement required Boyne to pay SPD for half of the value of the Lone Peak property. The Peak Agreement provides that Boyne will pay "the appraised value of the [Lone Peak] Property in the Swap" of land between the U.S. and BLS. The Peak Agreement estimates that the cost will be approximately $800 per acre.

¶62 The Gallatin Land Consolidation Act of 1998 required that the U.S. exchange land for "equal value." This requirement forced the U.S. to ascertain the appraised value of the Lone Peak property before the U.S. could "swap" the Lone Peak property with BLS. This land swap ultimately occurred and the final appraised value was determined. The price per acre does not appear to have been a question at trial. Neither party introduced direct evidence of the appraised value. Sufficient circumstantial evidence in the record establishes, however, that the final appraised value was $800 per acre.

¶63 Only one witness, Brian Wheeler (Wheeler), the director of real estate and development for Big Sky Resort, testified directly about the value per acre of the property.

21

Appellants asked Wheeler if he had "an understanding about the amount Boyne would have had to pay in 1998 dollars under [the Peak Agreement]?" Wheeler responded, "[i]t would be seven acres, just seven and a half, acres times $800." Appellants asked no additional questions to suggest that Wheeler incorrectly had stated the value per acre of the Lone Peak property. Appellants introduced no evidence at trial to suggest that the final appraised value of the property was anything other than $800 per acre.

*4. specific performance*

¶64 Specific performance constitutes an equitable remedy within the discretion of the district court. *Larson v. Undem*, 246 Mont. 336, 342, 805 P.2d 1318, 1323. Specific performance may be necessary when pecuniary compensation for a defendant's failure to perform pursuant to the terms of a contract fails to afford adequate relief. Section 27-1-411(2), MCA. A court presumes that the breach of the contract cannot be relieved adequately by pecuniary compensation for contracts that involve the sale of land. Section 27-1-419, MCA.

¶65 Boyne had fulfilled its obligation to transfer 25 acres of property and stood ready to pay SPD for the Lone Peak property. All parties understood that Boyne would pay $800 per acre for half of the Lone Peak property. The presumption in favor of specific performance applies to Boyne's claim under these facts. Section 27-1-419, MCA.

*C. LMH to Transfer Lone Peak Property*

¶66 The District Court ordered LMH to transfer title of the Lone Peak property to Boyne. The court may require the successor in interest to title to perform specifically the obligation of its predecessor if a successor was not a purchaser in good faith for value. Section 27-1-

421, MCA. "[O]ne who acquires or purchases property, knowing that the property is subject to a contract to be sold to another, may be compelled to perform the contract in the same manner and to the same extent as his grantor would have been liable to do had the grantor not made the transfer to him." *Naylor v. Hall*, 201 Mont. 59, 68, 651 P.2d 1010, 1015 (1982). Appellants argue, "there is no evidence in the record to establish that LMH was not a purchaser of the property in good faith."

¶67    Dolan, the same person who manages SPD, manages LMH. LMH acquired the Lone Peak property with full knowledge that the Peak Agreement required the conveyance of the property to Boyne. Further, Boyne had recorded a lis pendens on the property. SPD also transferred the property after Boyne had filed this lawsuit. The record supports the District Court's finding that LMH failed to qualify as a purchaser in good faith. LMH remains liable to perform the Peak Agreement in the same manner and under the same terms that SPD was required to perform. *Naylor*, 201 Mont. at 68, 651 P.2d at 1015.

*D. The District Court's Deduction of $6,188 from Boyne's Damage Award*

¶68    The District Court deducted $6,188 from Boyne's compensatory damage award to account for Boyne's contractual obligation to pay SPD for half of the Lone Peak property. Appellants deride this "post-hoc attempt to satisfy [Boyne's obligation to pay] by including it as an arbitrary setoff." *Eschenbacher* confirms that SPD's anticipatory breach of the Peak Agreement relieved Boyne of its obligation to pay before it filed this action. The District Court's grant of specific performance now requires Boyne to perform fully Boyne's obligation to pay for half of the Lone Peak property. Nothing arbitrary attaches to the District Court's decision to set off this amount from Boyne's compensatory damage award.

23

¶69    Appellants next argue that the District Court improperly valued the Lone Peak property. The District Court directed Boyne to subtract $6,188 from Boyne's damage award. The survey established that the Lone Peak property comprised 15.47 acres. The value of the Lone Peak property was determined to be $800 per acre. The District Court simply divided the 15.47 acres in half, and then multiplied the resulting 7.735 acres by $800. The court reached a final figure of $6,188. All of the evidence in the record indicated that the appropriate value of the property was $800 per acre. Appellants offer no evidence that the value of the property was anything other than $800 per acre.

¶70    Appellants further argue that the District Court improperly deducted this $6,188 in equal shares from each of Appellants' damages. Appellants argue in effect, that this deduction means that Boyne only paid SPD $3,094—half of the amount required under the Peak Agreement—and in turn, Appellants argue that Boyne paid $3,094 to LMH, even though LMH has no right to payment under the Peak Agreement. We agree with Appellants that it would be improper to require Boyne to pay LMH, a party with no rights under the Peak Agreement. Boyne must fulfill its contractual obligation by deducting the full $6,188 purchase price from the damage award assessed against SPD.

*E. Prescriptive Easement*

¶71    The District Court's order grants Boyne both an easement over the Lone Peak property and ownership of the Lone Peak property. Appellants cite this apparent inconsistency as further evidence of the District Court's "irredeemably contradictory" judgment. Boyne sought outright ownership of the Lone Peak property through its claim for

24

specific performance. Boyne also sought, in the alternative, an easement over the property so that Boyne could continue to use the Lone Peak property as part of Big Sky Resort.

¶72 The jury found that Boyne was entitled to an easement over the property. The District Court separately determined that Boyne was entitled to specific performance and therefore legal ownership of the Lone Peak property. The District Court's order provided that Boyne was entitled both to an easement and to ownership of the property. The District Court appropriately specified alternative relief in the event that this Court could have reversed the District Court's conclusion that Boyne was entitled to specific performance.

¶73 An easement holder's acquisition of legal ownership of the servient land extinguishes the easement associated with that parcel. *Tungsten Holdings v. Olson*, 2002 MT 158, ¶ 19, 310 Mont. 374, 50 P.3d 1086; § 70-17-105, MCA. Boyne's acquisition of legal ownership over the Lone Peak property will extinguish Boyne's easement on the same parcel and therefore eliminate any "irredeemable contradictions" in the court's judgment. *Tungsten Holdings*, ¶ 19.

¶74 *2. Whether the jury erroneously awarded compensatory damages to Boyne.*

¶75 The jury found that SPD and LMH each had deceived Boyne and that each had abused the legal process. The jury awarded Boyne $300,000 from SPD and $300,000 from LMH.

*A. Abuse of the Legal Process*

¶76 The tort of abuse of the legal process first requires proof of an ulterior purpose, and second, a willful act in the use of the process not proper in the regular conduct of the proceeding. *Brault v. Smith*, 209 Mont. 21, 28-29, 679 P.2d 236, 240 (1984). A decision to

25

press a valid legal claim to its regular conclusion, even with an ulterior motive, fails by itself to constitute abuse of process. *Brault*, 209 Mont. at 29, 679 P.2d at 240. The party alleging abuse of process must prove that the other party attempted to use the process to coerce the plaintiff to do some collateral thing that he legally and regularly could not be compelled to do. *Brault*, 209 Mont. at 29, 679 P.2d at 240.

¶77 Boyne alleged at trial that Appellants had abused the legal process through their filing of a frivolous counterclaim against Boyne that forced Boyne to defend itself for two and a half years. Appellants dropped this counterclaim the last business day before the start of the trial.

¶78 Appellants counterclaimed that Boyne had rescinded the Peak Agreement by transferring to SPH the 25 acres that Boyne was required to transfer under the Peak Agreement and the Southfork Agreement. Boyne argues that Appellants knew this claim to be frivolous in light of the fact that Appellants were asserting a contrary claim in a different lawsuit at the same time that Appellants made a claim for rescission for failure of consideration.

¶79 SPH, an entity owned by SPD, claimed in a lawsuit filed in the 18th Judicial District, Gallatin County, *Spanish Peaks Holding, LLC v. Boyne, USA*, Cause No. DV 06-570A, that Boyne had transferred all of its rights and obligations under the Southfork Agreement to SPH. This alleged transfer would mean that SPH no longer would be required to pay Boyne override fees for the property in Spanish Peaks Resort that would benefit from the ski in/ski out access to Big Sky Resort. This transfer of rights also would mean that Boyne no longer

had an obligation to transfer 25 acres to anyone. SPH further argued, in the Gallatin County action, that Boyne had failed to fulfill its obligation to transfer the 25 acres to SPH.

¶80   Boyne highlights the incompatibility of these three claims: (1) that Boyne was required to transfer the 25 acres to SPD; (2) that Boyne was required to transfer the same 25 acres to SPH; or (3) that Boyne was not required to transfer the 25 acres to anyone, because Boyne already had assigned all of its rights and obligations under the Southfork Agreement to SPH. Boyne argued at trial that the inconsistency of these three claims demonstrated abuse of the legal process.

¶81   Boyne further argued that Appellants had filed this legal claim for the ulterior purpose of convincing Boyne to do something Boyne was not otherwise required to do. Appellants sought to compel Boyne to transfer an additional 25 acres of property to Appellants before Boyne could receive the Lone Peak property. Appellants further sought to convince Boyne to modify or eliminate the override fees that the Southfork Agreement provided to Boyne.

¶82   Appellants defend this apparent duplicity on the basis that LMH was not a party to the action when SPD filed its allegedly frivolous counter-claim against Boyne. Boyne added LMH as a party in August 2009. Appellants filed their dubious counterclaim in September 2009. Appellants listed LMH as a party on their counterclaim. LMH participated in any abuse of the legal process perpetrated by Appellants.

*B. Deceit*

¶83   Boyne further alleged that Appellants had deceived Boyne. A deceit involves a suggestion of a fact that is not true by one who does not believe that it is true. Section 27-1-

27

712, MCA.  One who willfully deceives another with intent to induce that party to alter his position is liable for any damage that party suffers.  Section 27-1-712, MCA.

¶84     Between 2002, when Boyne transferred the 25 acres to SPH, and 2005, when SPD informed Boyne that Boyne had breached the Southfork Agreement, Dolan and Doyle made numerous statements to Boyne to imply that Boyne had not breached the Southfork Agreement.

¶85     SPD asked Boyne in 2003 to help SPD in a different lawsuit over the Lone Peak property.  The U.S. had transferred 0.16 acres of the Lone Peak property to Moonlight Basin.  SPD wanted to correct this mistake.  SPD worked with Boyne to litigate this matter against the U.S.  Boyne's assistance in this matter caused Boyne to believe that Dolan and Blixseth intended to transfer the Lone Peak property to Boyne after the U.S. had issued a patent.

¶86     Dolan and Blixseth sought to purchase Big Sky Resort from Boyne in 2003.  Dolan drafted and signed a letter that set forth the terms of a potential sale.  Dolan addressed the Lone Peak property.  Dolan wrote that this property would "inure to the benefit of the owner of the Big Sky Resort."

¶87     Boyne requested the Lone Peak property, other than the 0.16 acres, in 2004.  SPD's counsel, Doyle, responded that SPD could not yet transfer the property.  Doyle cited the fact that the U.S. would not issue a patent for the property until the conclusion of the litigation over the 0.16 acres.  Doyle made no mention that Boyne would not receive the Lone Peak property due to Boyne's breach of the Southfork Agreement.

¶88     Doyle simultaneously worked with Boyne to upgrade the Southern Comfort chairlift at Big Sky Resort.  The Southfork Agreement required Boyne to pay for the upgrade.  Boyne

28

also worked with SPH to determine from which lots Boyne would receive an override fee for the ski in/ski out access to Big Sky Resort. The Southfork Agreement entitled Boyne to these override fees. No one—not Blixseth, not Dolan, not Doyle, not anyone from SPD or SPH—ever suggested to Boyne that Boyne had breached the Southfork Agreement. Dolan ultimately conceded at trial that his implications to Boyne that the Southfork Agreement was still in good standing amounted to a false representation. Dolan further conceded that it would have been "prudent" to have disclosed Dolan's position that Boyne had breached the Southfork Agreement.

¶89 Appellants argue that LMH could not have deceived Boyne because LMH did not exist until after the lawsuit was filed. Appellants further argue that all of the allegedly deceitful activities occurred between 2002 to 2005. The jury found that LMH had deceived Boyne. We do not need to resolve whether the jury properly found that LMH had deceived Boyne because substantial evidence of damages exist from LMH's abuse of the legal process against Boyne. The jury awarded $300,000 either for LMH's abuse or deceit.

C. *Damages*

¶90 Appellants do not argue that they did not abuse the legal process or that they had a legitimate purpose for filing their frivolous counter-claim. Appellants also do not deny that SPD's actions deceived Boyne. Appellants instead argue that Boyne suffered only nominal damages from any abuse of the legal process or deceit. Appellants argue that no evidence in the record supports the jury's award of compensatory damages for either abuse of the legal process or deceit. Appellants claim that the jury could have awarded nominal damages, at most, for Boyne's two tort claims, rather than a total of $600,000.

¶91 Boyne argued to the jury that Appellants used the Lone Peak property as an asset to leverage Boyne on numerous matters, both related and unrelated to this litigation. The jury learned that Boyne and Dolan, through Dolan's various entities, had numerous contracts. Boyne argued that Dolan and Dolan's entities obtained favorable treatment on these other contracts by leading Boyne to believe that Boyne was in compliance with the Southfork Agreement between 2002 to 2005. Boyne further argued to the jury that Dolan and Dolan's entities had damaged Boyne after the litigation began by creating additional uncertainties in Boyne's business operations as a result of Appellants' abusive counterclaim.

¶92 The jury learned about Dolan's 2004 "Christmas List" email to Boyne. Dolan requested renegotiation of a number of contracts between Boyne and Dolan's entities in this email. Dolan requested that Boyne renegotiate a contract with Lone Moose Meadows that had made Boyne the exclusive rental manager for condominiums. Dolan wanted to discuss Boyne's operation of Big Sky Resort's Southern Comfort chairlift, including hours, opening and closing dates, and other matters that would benefit Dolan's entities. Dolan wanted to renegotiate the Purchase and Sale Agreement of 2002, which permitted only Boyne to operate ski rentals, ski repair, restaurants, and bars on the property. Dolan requested special lift line access for Dolan's ski instructors and guides, as well as season passes for Spanish Peaks Resort and Lone Moose Mountain staff. Dolan further requested advertising signs for Dolan's condominiums and properties throughout Big Sky Resort.

¶93 Dolan admitted at trial that he sought to modify multiple contracts that Dolan had with Boyne. Dolan claimed that he had taken a "holistic approach" in an effort to modify multiple agreements at once. Boyne argued that Dolan instead sought to leverage the

30

promise of the Lone Peak property against Boyne to extract concessions in these other contracts.

¶94 The jury learned that Boyne had spent $3 million to upgrade the Southern Comfort chairlift needed to facilitate the ski in/ski out access to Big Sky Resort as part of the Southfork Agreement with SPH. Boyne had disagreed with SPH about the timing of the upgrade, but ultimately had upgraded the Southern Comfort lift earlier than required under the Southfork Agreement. Boyne argued at trial that SPH, an entity owned by SPD, had induced Boyne to upgrade the Southern Comfort lift earlier by implying that the Southfork Agreement was still in good standing.

¶95 The Southfork Agreement also entitled Boyne to override fees for properties that SPH sold with ski in/ski out access to Big Sky Resort's chairlifts. The jury learned at trial that SPH had sold almost $83.5 million worth of property at Spanish Peaks Resort, but had not yet paid any override fees to Boyne.

¶96 Boyne also argued to the jury that SPD's failure to fulfill its obligation under the Peak Agreement had cost Boyne the opportunity to have held title to the property from 2004 to the date of the 2011 trial. LMH contributed to this damage to Boyne by its "purchase" of the property from SPD. Boyne could have transferred, leased, mortgaged, or sold the property according to its own wishes during those eight years. SPD's actions prevented Boyne from taking any of these steps. SPD "sold" the property to LMH for $250,000 during that time period. Boyne argued that this sale demonstrated that Boyne could have sold the property for $250,000 if Boyne had obtained title to the property.

31

¶97    The jury further learned that Dolan had attempted to interfere with Boyne's ability to obtain financing after Boyne filed this action. Boyne contacted CNL Lifestyle Properties, Inc. (CNL) to obtain a loan. Dolan contacted CNL's president to inform CNL's president that Dolan, rather than Boyne, owned the Lone Peak property. Dolan further told CNL's president that Dolan's ownership of the land could be a problem for CNL.

¶98    Appellants urge this Court to review the jury's award of damages on Boyne's tort claims of abuse of the legal process and deceit. Appellants characterize all of Boyne's damages as "speculative" and argue for application of the Court's analysis of contract damages in *Watson v. West*, 2009 MT 342, ¶ 34, 353 Mont. 120, 218 P.3d 1227. We instead will review the jury's damage award under our tort jurisprudence in light of the fact that the jury awarded $600,000 to Boyne for its tort claims.

¶99    We determine whether substantial credible evidence supports a jury's verdict. Substantial credible evidence comprises evidence that a reasonable mind might accept as adequate to support a conclusion. We view the evidence in the light most favorable to the prevailing party. *Seltzer*, ¶ 94. We afford the prevailing party any reasonable inference that can be drawn from the facts. The evidence will be considered substantial even if this Court views it as inherently weak and conflicting and somewhat less than a preponderance. Substantial evidence must consist of more than a mere scintilla of evidence, however, and it must rise above the level of trifling or frivolous. *Seltzer*, ¶ 94.

¶100   This Court will not substitute its judgment for the jury's judgment unless the amount awarded is so grossly out of proportion to the injury as to shock the conscience. *Frisnegger v. Gibson*, 183 Mont. 57, 67, 598 P.2d 574, 580 (1979). The jury learned of Appellants'

numerous efforts to leverage Boyne on a variety of issues. For example, Boyne spent $3 million to upgrade the Southern Comfort chairlift on an expedited basis due to Appellants' machinations over the Lone Peak property. Boyne could have performed the upgrade according to the original schedule and used the money for other purposes in the interim. Appellants failed to pay any override frees to Boyne on the ski in/ski out property despite having sold approximately $83.5 million of property at Spanish Peaks Resort. Boyne's delayed receipt of these override fees-- to which the Southfork Agreement entitled it -- cost Boyne the use of these override funds for a substantial period of time. We affirmed a jury's award of damages for lost investment value of funds that occurred due to a party's delay in *Kiely Constr. L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶¶ 104, 106, 312 Mont. 52, 57 P.3d 836. We also affirmed the jury's award of lost future investment value due to the defendant's delay. *Kiely*, ¶¶ 104, 106. Some of Boyne's damages mirror the type of damages that we affirmed in *Kiely*.

¶101    The jury awarded Boyne $300,000 in damages from SPD and $300,000 in damages from LMH for the related torts of abuse of the legal process and deceit committed by Appellants. Boyne presented evidence to the jury of substantial damages arising from Appellants' abuse of the legal process and from SPD's deceit of Boyne. Nothing shocks the conscience regarding the jury's award of $600,000 for Appellant's well cataloged abuses of the legal process and deceit. *Frisnegger*, 183 Mont. at 67, 598 P.2d at 580. We decline to disturb the jury's damage award.

¶102    *3. Whether the District Court properly awarded legal fees to Boyne pursuant to the terms of the contract.*

33

¶103 The District Court awarded $176,834 in attorney fees to Boyne pursuant to a provision in the Peak Agreement that provided attorney fees to the prevailing party. Appellants ignore this clear statement and implicitly argue that no contractual provision addresses attorney fees: "[w]ithout an explicit entitlement to fees . . . fees are not available." Appellants cite *Blue Ridge Homes, Inc. v. Thein*, 2008 MT 264, ¶ 78, 345 Mont. 125, 191 P.3d 374, for the proposition that a court may award fees "only where a statute or contract provides for their recovery."

¶104 The Peak Agreement contains an express provision related to fees. The Peak Agreement could not be more clear: "[i]n the event either party to this agreement finds it necessary to bring an action at law . . . to enforce any of the terms, conditions or covenants hereof . . . the party prevailing in such action or other proceedings shall be paid all reasonable attorney's fees by the other party."

¶105 Boyne submitted a claim for fees as directed by the District Court's judgment. Boyne failed to title its motion "Motion for Attorney Fees," however, as Appellants claim M. R. Civ. P. 54(d)(2)(A) requires. Boyne filed a motion entitled "Proposed Findings and Conclusions and a Statement of Attorney's fees." Boyne's motion set forth the amount of fees that Boyne sought and the basis for these fees. Boyne cites *Moody v. Northland Royalty Co.*, 286 Mont. 89, 95, 951 P.2d 18, 22 (1997), for the proposition that the substance of the document, rather than the caption should control. Boyne's submission requested attorney fees and detailed the amount of fees sought.

¶106 Nothing in M. R. Civ. P. 54(d)(2)(A), required Boyne to file a separate motion titled "motion for fees" when the Peak Agreement provided for fees to the prevailing party and

34

when the District Court directed Boyne to submit a claim for fees. Appellants' argument borders on frivolous. *See* M. R. App. P. 19(5). This Court generally has held that for purposes of characterizing post-judgment orders, "the substance, not the caption, of the document controls." *Moody*, 286 Mont. at 95, 951 P.2d at 22. "We shall look to the substance of a motion, not just its title, to identify what motion has been presented." *Miller v. Herbert*, 272 Mont. 132, 136, 900 P.2d 273, 275 (1995). Boyne's motion sufficiently put Appellants on notice that Boyne sought attorney fees in the amount described in the motion.

¶107 Appellants next insist that the District Court did not issue a valid fee award. The District Court issued its judgment on December 5, 2011. The District Court's judgment instructed Boyne to submit a statement of the amount of attorney fees sought within ten days. The District Court further provided that Boyne's claimed fee amount would be "incorporated into this Judgment as if fully set forth herein" if Appellants did not object to the attorney fees within ten days.

¶108 Boyne submitted its motion on December 12, 2011, with the amount of its claimed attorney fees. Appellants did not object to the amount of attorney fees or request a hearing within ten days. More than three weeks later, on January 3, 2012, Boyne submitted a Statement of Amount of Attorney's Fees to be Incorporated into Judgment. The court incorporated the fees into the judgment.

¶109 Appellants argue that they have not had an opportunity to contest the amount of fees. Boyne submitted its request for fees as the District Court ordered on December 12, 2011, and the District Court incorporated these fees into the judgment on January 3, 2012. Appellants finally filed a motion to contest Boyne's attorney fees on January 10, 2012. Appellants did

35

not object to the reasonableness, or to the amount of the fees, within the 10-day period. Appellants did not seek a hearing on the amount of fees within the 10-day period. Appellants' failure to make a timely objection when given the opportunity waives their right to object for the first time on appeal. *Entriken v. Motor Coach Fed. Credit Union*, 256 Mont. 85, 94, 845 P.2d 93, 98 (1992).

¶110   *4. Whether Boyne is entitled to legal fees on appeal.*

¶111   Boyne argues that the Peak Agreement entitles it to fees on appeal. We agree. A contractual provision that provides for attorney fees includes attorney fees for appeal. *In re Estate of Burrell*, 2010 MT 280, ¶ 41, 358 Mont. 460, 245 P.3d 1106 (*citing Boyne USA, Inc. v. Lone Moose Meadows, LLC*, 2010 MT 133, ¶ 26, 356 Mont. 408, 235 P.3d 1269). Boyne's status as the prevailing party entitles it to attorney fees reasonably incurred in enforcing the Peak Agreement on appeal. We remand to the District Court for a determination of reasonable attorney fees incurred on appeal.

## CONCLUSION

¶112   Our legal system provides a mechanism to resolve disputes between parties. Our review of the record convinces the Court that Appellants elected to use every procedural mechanism of our legal system to evade its contractual obligations, obfuscate, manufacture disputes, and leverage its business position in a duplicitous manner.

¶113   Appellants operated in this manner throughout the protracted period of negotiations with Boyne from the execution of the Peak Agreement in 1998 through Boyne's decision to file this action in 2008. Boyne had to litigate every major contract that it had entered with Appellants and their related entities. The bankruptcy proceedings in *In re Yellowstone Mt.*

*Club, LLC*, 436 B.R. 598 (2010), confirm that Appellants and their agents "do business" in this manner generally.

¶114 Appellants continued this course of conduct through this litigation in the District Court. Appellants claimed that SPD was the appropriate party to receive the 25 acres from Boyne under the Southfork Agreement despite the Assignment and Assumption document and Dolan's admission at trial that SPD had conveyed this right to SPH. Appellants urged the jury to ignore the Assignment and Assumption document that clearly specified this transfer of rights. Appellants filed a frivolous counterclaim that they dropped the final business day before the trial. Appellants asserted a position in this litigation, that Boyne had failed to transfer land to SPD, that was directly contrary to the position that Appellants had asserted in a different lawsuit in Gallatin County. Appellants further claimed that Boyne had "sold" SPH the 25 acres when Boyne actually had transferred the 25 acres as part of a larger land transaction to help SPH evade subdivision review.

¶115 Of greater concern to this Court is the fact that Appellants have elected to continue with this course of conduct on appeal. Appellants' challenge to Boyne's claim for fees based on Boyne's failure to caption its motion to the District Court as a request for fees underscores the baseless nature of their claims. Appellants further do not challenge on appeal the fact that they abused the legal process and committed deceit. As the record demonstrates, Appellants do not challenge these rulings with good reason. Appellants instead argue on appeal that their admitted abuse of the legal process and their admitted deceit caused no damages to Boyne. We cannot agree.

¶116 Affirmed.

37

/S/ Brian Morris

We Concur:

/S/ Michael E Wheat
/S/ Patricia O. Cotter
/S/ Beth Baker
/S/ Jim Rice